FIRST STATE BANK OF SEMINOLE v. SHANNON.

(Court of Civil Appeals of Texas. Amarillo. May 3, 1913. Rehearing Denied June 7, 1913.)

1. BANKS AND BANKING (§ 119*) — GENERAL AND SPECIAL DEPOSITS—RELATION OF BANK TO DEPOSITORS—"DEBTOR AND CREDITOR"— "DEBT."

A bank deposit of money is a "debt" owing by the bank to the depositor. When a general deposit is made, it is not contemplated that the identical money shall be returned, but the relation of "debtor and creditor" arises on an implied contract between the parties, whether the deposit is general or specific; the only difference being that the money specially deposited cannot be used for a purpose other than that for which the bank holds it, and if such purpose fails the bank is liable to a depositor for a return of the funds.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 289–292; Dec. Dig. § 119.*

For other definitions, see Words and Phrases, vol. 2, pp. 1864–1886, 1891–1893; vol. 8. p. 7628.]

2. BANKS AND BANKING (§ 126*)—DEPOSITS —DRAFTS.

Where plaintiff sent his draft to defendant bank to pay for bank stock which was not issued, and the draft, after collection, was deposited in the name of its president as trustee, the bank by so doing acknowledged its indebtedness to plaintiff, and the proceeds became a credit in favor of plaintiff, subject to check as a general deposit; the fact that the conduct of the bank was also tortious not defeating plaintiff's right of action upon the implied contract to pay, and the fact that the fund appeared in the name of the president as trustee not changing the bank's contractual relation or lessening its obligation to pay on demand.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 305, 309; Dec. Dig. § 126.*]

3. BANKS AND BANKING (§ 129*)—DEPOSITS —TITLE TO MONEY DEPOSITED.

Money, when deposited in a bank, becomes the property of the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 312–315, 326, 388; Dec. Dig. § 129.*]

---

**4. LIMITATION OF ACTIONS (§ 66*)—DEMAND AND NOTICE.**

Where the relation of debtor and creditor existed between defendant bank and plaintiff by reason of plaintiff's general deposit, plaintiff had no cause of action upon the bank's implied contract to repay until after demand for the debt or notification from the bank that his claim would not be paid; and hence the statute of limitations did not begin to run until such demand or notice.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 353–375; Dec. Dig. § 66.*]

**5. LIMITATION OF ACTIONS (§ 95*)—DEPOSITOR'S ACTION FOR CONVERSION—NOTICE OF CONDITIONS.**

In an action for the amount of a draft sent to defendant bank and by it indorsed, collected, and allowed to remain in the name of its president as trustee, who thereafter checked out the entire amount to his own use, which fact was purposely concealed from plaintiff by the bank, treated as an action for conversion, the statute did not begin to run until he learned the condition of the fund.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 337, 473, 474; Dec. Dig. § 95.*]

**6. BANKS AND BANKING (§ 154*)—ACTION BY DEPOSITOR — SUFFICIENCY OF EVIDENCE — BANKS—KNOWLEDGE OF PURPOSE OF BANK.**

Evidence, in an action against a bank to recover the amount of a deposit, *held* sufficient to sustain a finding that the bank's officers knew or should have known the purpose for which the amount collected on plaintiff's draft was received by the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 502–512, 515, 516, 518–533; Dec. Dig. § 154.*]

**7. BANKS AND BANKING (§ 116*)—OFFICERS AND AGENTS — LIABILITY FOR WRONGFUL ACTS.**

Where defendant bank received plaintiff's draft for $5,000 and collected it, leaving the amount as a deposit in another bank in the name of its president, as trustee, its cashier and president were engaged in the bank's business, within the apparent scope of their authority, and their knowledge that the draft was intended by the sender as payment for stock in the bank was imputable to the bank, and the president, created a trustee by the bank, was trustee for it, and his acts and conduct were its acts and conduct; and the fact that he afterwards misappropriated the funds did not relieve the bank from liability, since there was a privity between plaintiff and the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 282–287; Dec. Dig. § 116.*]

Appeal from District Court, Gaines County; S. J. Isaacs, Judge.

Action by J. M. Shannon against the First State Bank of Seminole. Judgment for plaintiff, and defendant appeals. Affirmed.

A. H. Kirby, of Abilene, F. E. Shell and D. J. Thomas, both of Seminole, and Theodore Mack, of Ft. Worth, for appellant. C. E. Dubois, of San Angelo, and Chas. E. Davidson, of Ozona, for appellee.

HUFF, C. J. The appellee, Shannon, brought suit in the district court of Gaines county against the appellant, the First State Bank of Seminole, Tex., for $5,000. The case was tried before the court without a jury, and judgment was rendered for appellee against appellant for the amount sued for, with interest thereon from the 5th day of July, 1910, at the rate of 6 per cent. per annum. As part of our findings of fact, we adopt the court's findings of fact, as follows:

"From the evidence given in the above styled and numbered cause, I find:

"(1) On or about the 8th day of November, 1909, the First State Bank of Seminole, Texas, was a banking corporation, organized under the laws of the state of Texas, and doing a banking business in the town of Seminole, Texas, at which time Ed Ramsey was its president, H. B. Ramsey was its cashier, and L. L. Cobb was its active vice president; all of said officers named being active in the discharge of their duties in said banking business.

"(2) On said date the plaintiff in this cause purchased from the First National Bank of San Angelo, Texas, a draft for the sum of five thousand dollars on the American National Bank of Ft. Worth, Texas, making the said draft payable to the First State Bank of Seminole, Texas, and sent same to the First State Bank of Seminole, Texas, addressed to Ed Ramsey, or to Ed Ramsey, president.

"(3) The purpose for which the plaintiff sent said draft for five thousand dollars to the defendant was to purchase fifty shares of capital stock in the defendant bank; Ed Ramsey, its president, having represented to the plaintiff that the capital stock of said bank would be increased.

"(4) The draft, aforesaid, was received by the defendant, the First State Bank of Seminole, by it indorsed, and through regular banking channels was collected by the defendant and placed to its credit in the First National Bank of Ft. Worth.

"(5) The proceeds of said draft were made a special deposit in the First State Bank of Seminole, in the name of Ed Ramsey, trustee.

"(6) Immediately after making such deposit Ed Ramsey wrote plaintiff a letter, which letter plaintiff received, advising him of the receipt of the five thousand dollar draft, and advising him that same was placed to the credit of Ed Ramsey, trustee, and further advising him that 'as soon as the boys can get ready and get together I will mail your bank stock for that amount.'

"(7) At the time of receiving the five thousand dollar draft the officers of the defendant, to wit, its president, cashier, and active vice president, knew, or should have known, in the performance of their duties as such officers, the purposes for which the five thousand dollar draft was received by the defendant bank.

"(8) Within a few days after the receipt

of the five thousand dollar draft by the defendant bank, Ed Ramsey began checking on said account, and within fifty days from the date of the receipt of same had checked out of the bank the entire deposit of five thousand dollars for his own use and benefit.

"(9) The plaintiff made no demand for the return of the five thousand dollars prior to the 28th day of June, 1910, at which time he made demand on the First State Bank of Seminole for five thousand dollars, which demand was refused, and afterwards he drew a draft on the defendant bank for five thousand dollars, which draft the defendant bank refused to pay.

"(10) At the time the plaintiff remitted to the defendant the sum of five thousand dollars, to wit, November 8, 1909, nor before that time, had the defendant bank done any of the things required by law preliminary to increasing its capital stock.

"(11) At no time after the receipt of the five thousand dollars by the defendant bank did the plaintiff authorize said bank to turn said five thousand dollars over to Ed Ramsey; nor did he authorize Ed Ramsey to use same for his own use and benefit; nor is there any competent evidence showing that the plaintiff ratified the use of same by the said Ed Ramsey.

"(12) The said Ed Ramsey, in soliciting plaintiff for a subscription to an increase of the capital stock of defendant, was acting without authority of the board of directors of said bank, and without knowledge of the board of directors of the defendant bank.

"(13) Plaintiff did not know that Ed Ramsey had checked out the five thousand dollars until after June 28, 1910, when he made demand on the defendant for the return of the five thousand dollars."

### Conclusions of Law.

"The draft received by the defendant bank, being payable to its order, could only be collected by being indorsed by defendant. It thereby came in possession of the five thousand dollars with knowledge of plaintiff's intention in remitting it, and became indebted to plaintiff in that amount. Plaintiff is therefore entitled to recover said amount, with interest thereon from the date demand was made for same."

In addition to the above, the following letters were introduced in evidence:

Letter from Ed Ramsey to appellee, dated October 20, 1909:

"I returned last night from Fort Worth, where I have been with a consignment of cattle, and found your letter awaiting me. In regard to the stock in our bank I will say that we are about ready to take it all up now. A good many have sent in their money and have it here ready, while others are waiting to market some cattle stuff. I would suggest that you send a draft for $5,000.00 on Fort Worth and there would be no exchange. By doing this there would be no delay when the others get ready, and we will at once forward you your stock."

Letter from Ed Ramsey, dated at Seminole, Tex., November 12, 1909, to appellee at Ozona, Tex.:

"J. M. Shannon, Esqr., Ozona, Texas— Dear Mr. Shannon: I received your letter written at San Angelo, with draft on American National Bank of Fort Worth, for $5,-000.00, which was placed to the credit of Ed Ramsey, trustee, and just as soon as the boys get ready and get together, I will mail your bank stock for that amount."

The customers' draft, remitting to the bank the $5,000, with the indorsement thereon, is as follows:

"Customers' Draft.　　No. 40654.

"The First National Bank.

"San Angelo, Texas, Nov. 8, 1909.

"——— Pay to the order of First State Bank of Seminole, Texas, $5000.00 five thousand dollars, value received, and charge to account of

"Not over five thousand $5,000$

"C. H. Powell, Cashier.

"American National Bank, Ft. Worth, Texas."

Stamped twice on face: "Paid, American National Bank, Fort Worth, Texas, Nov. 15, 1009."

Written across face in red ink three times: "Copy."

Written on back: "Pay to the order of any bank or banker. (All prior indorsements guaranteed.) The First State Bank, Seminole, Texas, H. B. Ramsey, Cashier. Paid Nov. 15, 1909, First National Bank, Fort Worth Clearing House."

This draft was sent to the First National Bank of Ft. Worth by appellant for collection, which was collected by that bank and the amount placed to the credit of appellant, the First State Bank of Seminole, Tex. The First National Bank of Ft. Worth was appellant's correspondent at Ft. Worth at the time of the collection. Ed Ramsey was the president of appellant bank at the time this money was deposited in the bank. Previous thereto Ramsey had represented to appellee, Shannon, that the bank would increase its capital stock about $25,000, and induced appellee to subscribe for 50 shares of the stock, represented at the value of $100 per share, and upon receipt of the letter above set out forwarded to appellant bank the customers' draft above set out, and afterwards received a letter, notifying him that the stock would be issued, but that the money had been deposited in Ramsey's name as trustee. He did not authorize Ramsey to draw out the money and to apply it on his (Ramsey's) debts, or for any other purpose, and had no knowledge that he had done so until some time in June. He de-

manded from appellant, in June, 1910, payment of the $5,000 so deposited, which it refused to do, and thereupon brought suit, which was filed February 6, 1912.

H. B. Ramsey, the son of Ed Ramsey, was cashier of the bank at the time of the transaction in question. The appellee lived in Crocket county, more than 100 miles from Seminole, at the time he forwarded the money and up to the bringing of this suit.

H. B. Ramsey, cashier of the bank, testified that: "The First State Bank of Seminole collected the draft in controversy in this suit, indorsed it, and deposited it to the credit of Ed Ramsey, trustee. Ed Ramsey, trustee, checked out the proceeds of said draft. That is all there is to it. Ed Ramsey was president of the bank and L. L. Cobb vice president of the bank when the check was paid; that is, when the proceeds about which I have testified were withdrawn from the bank by my father."

[1-4] The appellant urged in the court below the two-year statute of limitation, and in this court, by assignment, complains of the action of the court, in refusing to sustain his plea of two-year statute of limitation, because it is urged the facts show that appellee's cause was barred by the two-year statute of limitation. As we understand the contention, appellant asserts that if the bank placed the $5,000 to the credit of Ed Ramsey, as trustee, that such act was a conversion of the money, or, if not, then when checked out by Ramsey, and that appellee's cause of action then accrued. This deposit was made about November 15, 1909. The suit was instituted February 6, 1912. It is well recognized that a bank deposit is a debt owing by the bank to the depositor. Van Winkle Gin Co. v. Citizens' Bank, 89 Tex. 153, 33 S. W. 862; Baker v. Kennedy, 53 Tex. 200. When a general deposit is made, it is not contemplated that the identical money shall be returned; but the relation of debtor and creditor arises between the parties. Templeman v. Hutchings, 24 Tex. Civ. App. 1, 57 S. W. 868; Hoskins v. Velasco National Bank, 48 Tex. Civ. App. 246, 107 S. W. 598. Whether the deposit is a general one or for a specific purpose, as our courts sometimes say a special deposit, we do not understand that the relation of debtor and creditor is changed. The only difference is that the money so deposited cannot be used for a purpose other than that for which the bank holds it. There is no practical difference between such deposit and a general deposit, and it seems clear that the bank should be held to the same liability as for a general deposit. If the purpose for which this specific deposit was made fails, the bank is liable to the depositor for the return of the funds. Morse on Banks and Banking, §§ 207, 208, and 210; Ellis v. National Exchange Bank, 38 Tex. Civ. App. 619, 86 S. W. 776. If, in this case, the relation of debtor and creditor is found to exist between ap-

pellant and appellee by reason of the deposit of the $5,000 with appellant, then the appellee had no cause of action until demand was made for the debt, or notification from the bank that his claim would not be paid; and therefore the statute of limitations did not begin to run until such demand or notification. Morse on Banks and Banking, § 322, D and E, and the entire section. Arnold v. Penn, 11 Tex. Civ. App. 325, 32 S. W. 353. The evidence clearly indicates the purpose of appellee in sending the draft was to pay for the bank stock. This was not issued, and the bank deposited the amount with its funds in the name of Ed Ramsey, trustee. Having so deposited the funds, it made that sum a credit in favor of appellee and subject to check as a general deposit. Although appellant selected Ed Ramsey as trustee, it nevertheless recognized appellee as the beneficiary whose money was deposited, and which appellant had collected on his draft in its favor, and by so doing acknowledged that it was indebted to him in that sum. The bank devised that method of keeping the deposit, and the fact that it kept the money in the name of its president, as trustee, did not change the fact that it had appellee's money on deposit and was due him that amount when the time came for the demand.

As stated above, a deposit with the bank created the relation of debtor and creditor. This arises as upon an implied contract. First National Bank v. Greenville National Bank, 84 Tex. 40, 19 S. W. 334; Baker v. Kennedy, 53 Tex. 200; Dunkin v. Magette, 25 Tex. 245. This deposit must be in money, and when so made implies the obligation to repay in money of equal value upon demand. Money, when so deposited, becomes the property of the bank. This is so well established that the citation of authorities is unnecessary. This being a suit for a debt due upon demand and upon an implied promise to pay, the fact that the conduct of the appellant bank was also wrongful or tortious, and that it may have so conducted itself with its president as to have given appellee a right of action for such wrongdoing, ought not, and we do not believe will, defeat his right of action upon the implied contract to pay. If we are correct in our position, the statutes of limitation did not begin to run until demand and refusal to pay. In sending the $5,000 to appellant by appellee, and appellant in placing that amount with its correspondent at Ft. Worth, thereby increasing its assets, created an obligation on appellant's part to pay appellee the amount so received when called for. That obligation does not rest on the ground of conversion or tort, but on a simple contract to pay a debt. This will be true, we think, whether Ed Ramsey was acting as the agent or trustee for appellant or appellee, or for both. The fact that the deposit appeared in his name as trustee did not change the contractual rela-

tion existing between appellant and appellee or lessen the appellant's obligation to pay the same on demand. The case of El Paso National Bank v. Fuchs, 89 Tex. 197, 34 S. W. 206, cited by appellant, we do not think contrary to the general proposition stated by us. In that case Judge Brown held that the cause of action alleged against the president of the bank was one sounding in tort, and therefore an attachment against his property would not lie under our statutes. The case of Bank v. Bernard, 30 S. W. 580, was a suit for conversion of money, and not to recover on an implied contract to pay.

[5] But if this should be treated as an action for conversion, the facts show that the appellee did not learn of such conversion until less than two years before the filing of the suit. The evidence is sufficient to show that the bank purposely concealed from him the true situation; that it knew, or should have known, for what purpose the money was sent to the bank—that is, to purchase bank stock which the bank knew it had not issued and did not intend to issue. It knew that the $5,000 had been appropriated to Ed Ramsey's private use and debts, and that the appellee was the beneficiary of the same so deposited in its bank. The appellee lived more than 100 miles from Seminole, and had to depend largely upon what he could learn through the bank officials. We do not think the statute ought to begin to run until he learned the condition June 28, 1910, as found by the court. Oldham v. Medearis, 90 Tex. 506, 39 S. W. 919; Mortgage Co. v. Pace, 23 Tex. Civ. App. 222, 56 S. W. 377; Cooper v. Lee, 1 Tex. Civ. App. 9, 21 S. W. 998.

The appellant does not assign error upon the action of the court in overruling its special exception to the petition, to the effect that appellee's cause of action is barred by the two-year statute of limitation. The court sustained other special exceptions of appellant, and his action thereon left for consideration only the question of appellant's liability in receiving the $5,000 on deposit. The conclusions filed by the trial court evidence the fact that he considered the case upon that question only.

[6] It is urged by appellant, in various assignments, that the court was not warranted in finding that the officers of the bank knew, or should have known, in the performance of their duties as such officers, the purpose for which the $5,000 draft was received by defendant bank. We think the facts sufficient to support the findings of the trial court.

[7] It is also contended that Ed Ramsey was engaged in an independent fraudulent act, and that the bank would not be bound by such acts of Ramsey. As we understand, the learned trial judge so held, and only held the bank on the proposition that it received the draft, payable to its order, and collected it in the usual and customary way, and thereby came into possession of the $5,000, which it deposited in its bank, and by such act became indebted to the appellee. We think this is a sound proposition. The court did not hold the bank for the false representations made by Ramsey in order to sell bank stock, but for receiving appellee's money on deposit and refusing to pay the same upon demand. The bank, when it received the draft, payable to its order, indorsed it by its cashier, collected the money, and placed the same in the vaults as an asset of the bank, and thereby it became liable to appellee for the amount so held. In receiving the money, payable to a bank, and placing the same on deposit, the cashier and president of a bank are certainly engaged in the business of the bank, their principal, and were, in so receiving the money, acting within the apparent scope of their authority; and the knowledge of the officers of the purpose of the sender of the money and of having it deposited must be imputed to the bank. The knowledge so obtained was acquired while in the transaction of the business of the principal, the bank. This draft was not payable to Ramsey, but it was payable to the bank. The bank was made the agency for holding this money by appellee, and not Ramsey. The bank, after securing the money, created Ramsey a trustee. In doing so we think it should be held that he was trustee for the bank, or its agent, and that his acts and conduct were the acts and conduct of the bank. The mere fact that he notified appellee how the money was deposited and held did not make Ramsey the agent of appellee. When the deposit was made, the money became that of the bank, with an implied contract to pay its value upon demand. In the reception of the draft and in the deposit thereof the cashier and president were acting in behalf of the bank and within the apparent scope of their authority, and the fact that they afterwards wrongfully appropriated the funds cannot relieve the bank from liability. City National Bank v. Martin, 70 Tex. 643, 8 S. W. 507, 8 Am. St. Rep. 632; Bank v. Greenville Cotton Oil Co., 24 Tex. Civ. App. 645, 60 S. W. 828; Smith v. Bank, 1 Tex. Civ. App. 115, 20 S. W. 1119. The bank, having held out to the public that its officers were honest and worthy of trust, ought to suffer for their defalcation, rather than the person induced to deposit with it. We think a sound public policy dictates such a rule. It was said by the Supreme Court in the case of Merchants' Bank v. Bank, 77 U. S. (10 Wall.) 604, 19 L. Ed. 1008: "Where a party deals with the corporation in good faith, the transaction is not ultra vires, and he is unaware of any defect of authority or other irregularity on the part of those acting for the corporation, and there is nothing to excite suspicion of such defect or irregularity, the corporation is bound by the contract, although such defect or irregularity in fact exists. If the contract can be valid under any circumstances, an innocent party in such a

case has a right to presume their existence, and the corporation is estopped to deny them. * * * The principle has become axiomatic in the law of corporations, and by no tribunal has it been applied with more firmness and vigor than by this court. * * * Corporations are liable for the acts of their servants, while engaged in the business of their employment, in the same manner and to the same extent that individuals are liable under like circumstances. * * * Those who created the trust, appointed the trustee, and clothed him with the powers that enabled him to mislead, if there were any misleading, ought to suffer rather than the other party."

We do not think the facts in this case fall under the rule announced in the cases of Coleman v. Bank, 94 Tex. 605, 63 S. W. 867, 86 Am. St. Rep. 871, and Interstate National Bank v. Claxton, 97 Tex. 569, 80 S. W. 604, 65 L. R. A. 820, 104 Am. St. Rep. 885. Ramsey was not acting for appellee in making the deposit. As stated heretofore, appellee did not trust him personally with the money, but sent it direct to the bank. The bank must have known the purpose of such draft; and when it chose to select its president in a fiduciary relation to that fund, and thereafter paid out the money on his obligation and on his own checks, it would be doing violence to common knowledge in the banking business to hold that it did not participate in the misapplication of the funds. In this case there existed a privity between the bank and appellee, and in passing the deposit to the account of Ed Ramsey the bank was guilty of participating with Ramsey in a fraudulent conversion of the money. Bank v. Jones, 18 Tex. 811.

We are of the opinion that the lower court correctly disposed of the case, and that the judgment should be affirmed. The case is therefore affirmed.