## ALEXANDER et al. v. SECURITY BANK & TRUST CO. et al.

(District Court, S. D. Texas, at Houston. May 17, 1921.)

No. 136.

1. **Trusts ©⟳358(1)—Sufficient to trace trust funds into deposit of agent, appropriated by bank to his personal debt.**

   In tracing trust money, misappropriated by a bank, with the connivance of a depositor, in payment of his private debt to the bank, it is sufficient if the trust funds can be sufficiently traced to be reflected in the deposit, and it is not essential that the identical money be located.

2. **Trusts ©⟳356(2)—Bank held liable for trust funds applied to depositor's indebtedness.**

   A depositor of defendant bank was a shipper of produce, in part of that bought by him, and in part as agent for others, and in making shipments he deposited drafts on consignees, which were accepted by defendant as cash and credited to his account. He had small capital, and in the course of an unfavorable season became indebted to defendant in the sum of $15,000. During the next season, when he was making large shipments, known by defendant to be in large part on commission for plaintiffs and others, but depositing the drafts in the usual way to his own credit, defendant obtained from him a number of checks, and from time to time, as his account warranted, applied such checks in payment of his indebtedness. *Held* that, so far as drafts for shipments owned by plaintiffs could be traced into the deposit so withdrawn, defendant was liable therefor.

3. **Estoppel ©⟳88(1)—Attempted settlement with agent for funds misappropriated held not an estoppel to follow the funds.**

   Where a bank in which an agent had deposited funds of his principals to his own credit, with knowledge of their trust character, had procured their application in payment of a debt of the agent, the owners of the funds *held* not estopped to maintain a suit against the bank by taking notes of the agent, with personal security, for part of the amount, pursuant to an agreement for settlement made without knowledge by them that the bank had received the money, and which was not carried through, so as to constitute an accord and satisfaction.

4. **Subrogation ©⟳10(1)—Trustee ex maleficio is not entitled to subrogation.**

   A trustee ex maleficio *held* not entitled in equity to be subrogated to securities held by complainants for their own protection.

In Equity. Suit by Joseph Alexander and others against the Security Bank & Trust Company and another. Decree for complainants.

This is a suit in equity by the complainants, seeking to follow certain moneys of theirs which came into the hands of Martin, as their agent, and which were by him deposited in the Security Bank & Trust Company, and thereafter checked out to persons other than plaintiffs. The admitted facts are these:

That Jesse Martin, doing business in Wharton county, Tex., under the firm name of Jesse Martin & Co., conducted on his own account and as broker for others the business of buying and selling potatoes, grain, hay, and other kinds of produce. That he had been conducting this kind of business for some time prior to 1918, when the facts out of which this controversy arose transpired; that it was, and had been, his custom for some time to do his banking business through the Security Bank & Trust Company in his own name. That in the year 1917 he had handled for plaintiffs in this case their potato crop, which was planted, grown, and marketed at and from Wharton, Tex., in 1917

©⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and 1918, and that during both these years he also handled a large amount of business, some on his own account and some as agent for others, and that practically all of his business was, and had been for a long time, transacted through the defendant bank.

That the course of handling the business of plaintiffs was in 1917, when the potatoes were loaded on the cars, that he would handle the shipping and sale of same, make all proper deductions which arose in closing up the account sales for the respective cars, and after deducting his commission of $15 per car would remit to complainants the net amount due them. The same arrangement existed in 1918, with the exception that he had an understanding with complainants that, instead of paying them by checks, he would deposit their net funds to their account in the Wharton Bank & Trust Company, and pursuant to that agreement he did deposit the sum of $8,000 in that bank; the balance of their funds, $16,000 in round numbers, he deposited in the Security Bank & Trust Company, and checked them out to persons other than complainants; and complainants, with the exception of some small amounts later paid them by Martin after the misappropriation of their funds was discovered, have received none of said $16,000.

The evidence shows that Martin was a man of small capital, or, as one of the directors of the Security Bank & Trust Co. stated, "His stock in trade was a lead pencil and a piece of paper;" but the evidence also shows that he was a very active, energetic trader, and handled quite a large volume of business during the crop year. Due to weather conditions, which affected corn which Martin was handling in the year 1917, and due to delays and congestion in railroad traffic and other causes beyond Martin's control, during the year 1917 and the first part of 1918, there was accumulated a considerable debt to the bank, reaching in April, 1918, about $15,000.

This debt was represented by drafts which, in accordance with their regular custom, the bank had taken as cash items, payment on which had been delayed or refused, so that, instead of the case being, as it had formerly been, that with few exceptions the drafts which Martin put through the bank sufficed, upon their acceptance and payment by the drawee, to keep his account with the Security Bank in proper condition, such an unsatisfactory condition from a banking standpoint had arisen that Martin had a conference with the president of the bank and Wright, the cashier and active manager, in April, in which this condition was called to his attention, he was advised that the bank could not, without great embarrassment, continue to carry these long overdue drafts, and was induced to promise that as soon as possible he would take up these drafts, giving the bank cash therefor.

That subsequently the potato season came on, and Martin handled a large amount of potatoes, some of which he bought outright, but at least 90 per cent. of which was handled by him on commission. As the result of moving these cars of potatoes there went through Martin's account, after the 1st of May, something over $40,000, and while these funds were going through the bank Mr. Wright, the cashier, went to Martin and called his attention to the fact that he had promised to take up the $15,000 or so of long overdue drafts which they held of Martin's, and wrote out and caused Martin to sign checks on his account with them, aggregating the amount of the overdue drafts. This transaction took the form, according to the testimony of the cashier, of several checks, so that they could be passed through the bank as Martin's account would warrant, and covered a period of five or six days.

As before stated, the funds which went to Martin's credit during this active period were realized in large part by the delivery by Martin to the bank of drafts with bills of lading on moving cars attached, which drafts were taken by the bank as cash items, and for the amount of the drafts Martin was given immediate credit. Some few of these drafts were later returned unpaid, but that fact is immaterial, since the receipt of the drafts as cash items and the deposit of their value in cash stands, as to complainants, exactly the same as though Martin had gotten the money from the consignees and placed it to their credit, and any claim which might accrue to the bank because of the nonpayment of drafts would be a different cause of action, resting upon a different consideration.

The above are the undisputed facts. The only matters upon which there was any dispute on this branch of the case were: (1) Whether the bank knew, when they got Martin to sign checks on his account to pay up a past-due indebtedness to them, that these checks were being satisfied with moneys actually belonging to complainants; in other words, whether they knew that Martin was using his clients' moneys to pay his own debts; and (2) if they did know it, what amount of complainants' moneys the evidence sufficiently shows were appropriated by the bank to pay Martin's debt to it.

On the first of these matters the case presents no difficulty, for, notwithstanding the fact that the officers of the bank, particularly Wright, testified that they did not know that Martin was doing business as a broker, and did not know that any of the funds deposited by him were moneys of his principals, the testimony of Martin is equally positive that they did know these facts, and every fact and circumstance in the case in an overwhelming way points to the same conclusion. It is simply inconceivable that a banker, in the position which Wright occupied toward a customer such as Martin, who was heavily indebted to the bank, could have been as ignorant of Martin's business and condition as Wright claims to have been; nor is his claim to credence strengthened by the testimony of his conversations with Ingram, which, to put the most favorable light on them, were distinctly uncandid. I have therefore no difficulty in holding that the bank knew that Martin was operating on a shoestring, and handling his customers' money, and particularly the money of complainants in this case.

The second point in dispute, as to the amount of complainants' money which the bank actually misappropriated, is more difficult. The evidence establishes without contradiction that the major part of Martin's potato business in May and June was commission business, or, as he himself testified, about 10 per cent. of the business was his own, the balance commission, and with the exception of about $8,000, which he depoited in the Wharton Bank & Trust Company to the credit of complainants in this suit, all moneys received by him on account of all his clients were deposited by him in his own name in the Security Bank & Trust Company; the books of the bank showing that during the months of May and June there was over $40,000 deposited by Martin in the bank, of which approximately $16,000 was the money of complainants in this case, the balance belonging in part to Martin, but the larger part to clients of his.

Martin testified that the drafts for the potato crop were put in in May and June; that the crop started rolling in May, but most of it rolled in June. He also testified that about half of the drafts covering complainants' potatoes were deposited prior to the 1st of June, and about half between that day and the 10th, but that this was just a matter of opinion. That he did not think it would be possible to check over the papers and determine which drafts belonged to complainants and which belonged to others. The drafts and other records of the bank covering Martin's account were offered in evidence, and from them the respective counsel have made up a statement undertaking to trace the complainants' drafts into the bank, and by comparing these receipts with the checks upon which the bank satisfied Martin's debt to it to determine just how much of complainants' money the bank actually got.

The results obtained by respective counsel have not been alike, nor is the court entirely satisfied, after checking the matters himself in the light of counsel's efforts, that the evidence is in the shape it ought to be in to permit of an entirely satisfactory tracing. I am of the opinion, however, and will so find, that the evidence is sufficient to show that of the funds of complainants which were deposited in the bank the bank obtained on the checks of Martin $7,800. In view, however, of the unsatisfactory character of the evidence, either party may make application, should it so desire, to reopen the case on this point.

In addition to the issues set out in the foregoing statement of facts the case presents an issue of estoppel, based upon the following facts, most of which are undisputed:

That after the plaintiffs had discovered the fact that their moneys had been misappropriated by Martin, and before they had obtained the precise information as to who had gotten their money, an attempt was made to make a set-

tlement with Martin, which attempt resulted in Martin paying a small amount of cash and produce, giving notes with personal indorsement for a part of the balance, and making an agreement, which was not fulfilled, to close the adjustment by the securing of an additional loan of $1,000 indorsed by personal security. The last-named note not having been obtained, the settlement fell through; but the issue is made by defendants Security Bank & Trust Company that the acceptance of payment on account from Martin and the taking of his notes constituted either a novation, accord and satisfaction, or in some way established a situation which released the bank, because, as they claim, after Martin had had these dealings in an attempt to effect a settlement, he advised the bank of them and stated to them that he had thereby saved them from a lawsuit; that the bank, upon receipt of that information, surrendered to Martin some collateral which they held to secure his debt to them, and had thereby had their position made worse; whereas, had complainants not made the settlement, or had they advised the bank that they intended to hold it responsible, such delivery to Martin of their securities in hand would not have occurred.

The testimony of complainants on this score is that they did not know, and could not get information from the bank from which they could ascertain, the facts as to the bank's liability, and the evidence bears out their contention that they were wholly unable to get any information whatever from the bank. There is no evidence that any of the complainants ever stated to the bank that they were not looking to it, or in any way advised the bank, or induced the bank, unless their failure to sue the bank earlier could have that effect, to take any action in the matter.

Upon these facts the bank contends that complainants should be estopped to proceed against them in this suit, and further that, if they are not so estopped, they shall surrender to the bank what securities, if any, the defendants obtained in their negotiations with Martin. These securities are not declared on by complainants, or referred to in the pleadings by either complainants or defendants; but they were presented ore tenus in court for such action as the court might think proper to take upon the same.

Williams & Neethe, of Galveston, Tex., for plaintiffs.

Kelley & Hawes, of Wharton, Tex., and Terry, Cavin & Mills, of Galveston, Tex., for defendants.

HUTCHESON, District Judge. [1] No character of case better illustrates the principle of the equitable maxim, "Ubi jus ibi remedium," than that of tracing trust moneys misappropriated by banks with the connivance, or through the active agency, of a depositor who has used his principal's money to pay his private debts, for though in years past the courts found difficulty in stating the law of the case growing out of the fact that money has no earmarks, the principle is now almost universally recognized that it is sufficient if the trust funds can be sufficiently traced so as to be reflected in the amount of the deposit, and it is not essential that the identical money be located. Many cases have stated the matter, but none better than the case of Santa Marina Co. v. Canadian Bank of Commerce (D. C.) 242 Fed. 143, where the authorities are collated; nor have I found a better discussion of the general principle or better collection of authorities than is contained in the very interesting note in L. R. A. 1916C, 21.

These authorities and others like them make it plain that there is no real legal difficulty at all in the application of the trust doctrine to moneys deposited and misapplied, but that the real trouble arises in the application of the principle to the facts of a particular case, for it is

of course fundamental that funds must be traced before the trust can be asserted in them. This is clearly settled by numerous authorities, and perhaps nowhere better stated than in Board of Commissioners v. Strawn, 157 Fed. 49, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100. The same case establishes a doctrine, which has been reaffirmed and specifically applied in Schuyler v. Littlefield, 232 U. S. 707, 34 Sup. Ct. 466, 58 L. Ed. 806, that if the mingled fund is reduced below the amount of the trust fund the latter must be regarded as dissipated, except as to such balance, and sums subsequently added cannot be treated as part of the trust fund.

It is hardly necessary to state that the courts recognize that in the interest of commercial security a bank may safely deal with a depositor without undertaking to scrutinize the source of his deposits, or, even if the trust character is known, seeing to the proper application of the funds. It is well settled that a bank has the right to assume that the depositor is acting within his authority, and will deal justly by his principal; but this rule breaks down, or rather, has no application, where a bank, with knowledge of the trust character of a deposit; assists the depositor to misapply it by appropriating it, either by a charge ticket, or through the check of the depositor, to the private obligation owed by the depositor to the bank.

[2] It is conceded in this case that the funds of the complainant in dispute were deposited by Martin in the defendant bank in his own name, and that these funds were all checked out by Martin to others than complainants; nor is there any dispute that the bank, during the period when the funds, or some of them, were being deposited by Martin in the bank, caused Martin to sign checks for and received payment of $14,862.75 of debts in the form of unpaid drafts long overdue from Martin to the bank. Nor, since I accept and approve the proposition of defendant's brief that, in giving Martin a deposit receipt for the drafts, the legal effect was the same as if the consignee had paid Martin the same amount of money in the bank, is there any doubt that the money realized from the drafts drawn against plaintiffs' potatoes by their acceptance as cash items by the bank was the money of complainants. Commercial Bank v. Armstrong, 148 U. S. 50, 13 Sup. Ct. 533, 37 L. Ed. 363. The money stood in exactly the same case as if Martin had gotten it from the drawees of the drafts and deposited it.

The question, therefore, of bona fide purchase of the drafts by the bank, or whether the matter should be treated as a purchase by the bank of the plaintiffs' potatoes, in which event, of course, the bank could get no higher title than Martin had, and would be liable for the value of the personal property, is not in the case. The case upon the law and the evidence is one where the moneys of complainants was with the knowledge of the bank to the extent of $7,800 appropriated by the bank, with the consent of the defendant Martin, to pay Martin's debt, and upon the plain principles of law above set out the complainants are entitled to recover from the bank that sum, unless the proposition of estoppel of the defendant bank avails to defeat recovery.

[3] A very interesting discussion of a similar situation is found in the case of Bank v. Jones, 18 Tex. 811, to which I deem it unnecessary to add that, this being a suit in equity, and the defendant having been found in default ex maleficio, through a deliberate and knowing misappropriation of complainants' funds, this court will be slow to erect out of a transaction which admittedly failed to result in an accord and satisfaction an estoppel by which the bank could keep the fruits of its wrong. While the case of Parkerson v. Borst (C. C. A.) 264 Fed. 766, is not exactly in point on the facts, it at least illustrates the disinclination of a court to lend too ready an ear to the wrongdoer's plea of election or estoppel.

The facts here which present an absolute failure to reach an accord and satisfaction present the strongest kind of case for the application of the doctrines of that case and of Bank v. Jones, 18 Tex. 811, supra. In what is here said it is not meant to declare that, had a complete accord and satisfaction between plaintiffs and Martin been reached, the effect would not have been a ratification of the acts of the agent, and an agreement on the part of the principal to treat the funds deposited by the agent in the Security Bank, and by him applied to his debts as a loan. No facts, however, warranting such a conclusion appear in this case. Neither the pleadings of the plaintiffs nor the defendant Martin declare upon these papers, nor in my opinion do they present any defense to this suit, or have any proper place in it.

[4] As to the remaining contention that these securities should be delivered to the defendant bank, it is sufficient to say that I can conceive of no theory upon which a trustee ex maleficio can in a court of equity require that a complainant deliver to him securities or documents which he holds for his own protection, even if the documents be treated as evidencing existing obligations of the codefendant, which I do not now mean to hold.

The result of these views will be that complainants should have judgment against Martin for the full amount of the balance due by him, the debt having arisen through misappropriation of trust funds, and being therefore unaffected by the bankruptcy, with interest on same from the time of its misappropriation, and that complainants should also have judgment against the defendant bank for $7,800, with interest from June 1, 1918, and against both defendants for costs.