## DANIEL BAKER COLLEGE v. ABNEY.*
### No. 7481.

Circuit Court of Appeals, Fifth Circuit.
Dec. 22, 1934.

R. R. Holloway, of Brownwood, Tex., for appellant.

McGillivray Muse and Gib Callaway, both of Brownwood, Tex., for appellee.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

In a suit to foreclose notes it had given the Citizens' National Bank in Brownwood, renewing and extending notes originally executed to Coggin National Bank, the college unsuccessfully sought by counterclaim to offset deposits in substantially the same amount it had had with the Coggin Bank. Its claim was that the Citizens' Bank in Brownwood, in taking over from the Coggin National Bank, and the Citizens' Bank in Brownwood, in taking over from the Citizens' Bank of Brownwood, had each in its turn obligated itself for these deposits. It is here challenging as inequitable the decree of the District Court holding it to its notes given in renewal of the Coggin notes, without holding the plaintiff bank to the deposit liability of the Coggin Bank.

The record presents a sorry picture of the spoliation of a trust, accomplished by a combination of the rascality of one of the trustees and the pitifully amiable inefficiency of the others when confronted with his fraud and a succession of bank failures.

For many years prior to December 20, 1930, when the Coggin Bank closed, it had been engaged in the banking business in

*Rehearing denied Feb. 28, 1935.

Brownwood. E. B. Gilliam was, when it closed, and for many years before had been, a director and vice president of the bank and the principal owner of Gilliam Dry Goods Company, a partnership. He was also, and had for a long time been, a member of the board of trustees and chairman of the finance committee of the college. As such chairman since about 1925, he had had complete charge of its funds, the other members of the committee, Knox, president of the board of trustees, and Tabor, having been more or less inactive. He handled its moneys, received public subscriptions, collected the income, made deposits and disbursements, and from time to time made financial reports to the board of trustees. For some time before the Coggin Bank closed, the college had had on deposit with it in various accounts, sums of money in excess of $19,000. Along in 1925 Gilliam first commenced to overdraw his store account at the bank. He covered these overdrafts by checking against the different bank accounts of the college. By September, 1930, Gilliam, with the knowledge of the bank, but without the knowledge or consent of the college, and without right or authority to do so, had covered with checks on college funds Gilliam Dry Goods Company's overdrafts aggregating $18,900. It resulted from this that on December 20, 1930, when the Coggin Bank closed, its books showed deposits to the credit of the various college accounts of only $1,-695.32. Whereas at that time, since the drafts of Gilliam were unauthorized and known to the bank to be so, and were without effect on the college's deposit balances, the Coggin Bank really owed the college on deposit account $20,995. On that date the Coggin Bank held unmatured notes of the college, executed with express authority, aggregating $12,000, and one note of $6,000 executed by Gilliam without the express authority of the board, but to take up and release an authorized indebtedness of the same amount. On that date the Coggin Bank made an arrangement with the Citizens' National Bank of Brownwood, by which practically all of its assets, with certain exceptions set out in the exhibit attached, were transferred and its liabilities assumed. This was the way the contract of assumption read:

"In consideration of said transfer the said Citizens National Bank does hereby agree to assume, pay off and discharge all liabilities or indebtedness of said Coggin National Bank as evidenced by its own outstanding obligations or amounts due by it to any other bank, person, firm or corporation, as is also shown on its books at the close of business December 20, 1930, and referred to in said Exhibit C."

Assumption of stockholders' liability was expressly negatived. Immediately after this transfer the Citizens' Bank began to press the college for payment of an overdraft for $1,800 appearing on the Coggin's books in one of its accounts, and, Gilliam failing to cover, though repeatedly requested, as finance chairman, to do so, the bank began a check of the other accounts of the college. As the result of this check, Gilliam's dishonest manipulations were discovered and reported to Knox, who took the matter up first with Gilliam and the bank, and later with the board, with the result that a complete audit was ordered and finally made covering the whole period of Gilliam's management.

In October, 1931, the Citizens' Bank of Brownwood closed, and on January 10, 1932, its assets were transferred to the Citizens' National Bank in Brownwood, which had been formed to take over and carry on its banking business. The agreement of transfer provided that the new bank would assume the ledger liabilities of the old bank with certain exceptions, and thereby assist in liquidating the old bank. It recited that the old bank sold to the new bank all of its property and assets, both ledger and nonledger, cash on hand and in its vaults, balances with its correspondents, notes or other evidences of indebtedness, bonds, warrants and securities, banking house premises and other real estate owned, and all other property of whatsoever kind and character and wherever situated. It recited further that the new bank has assumed and does hereby assume the liabilities of the old bank as shown by its individual ledgers and general ledgers as of the date of the consummation of this agreement, with an express exception against liability to stockholders. In the meantime, Gilliam's transactions had been thoroughly aired before the board of trustees, before the grand jury, and with the general public, and all the facts as to his attempted spoliation of the college were well known when they took the old bank over, to the officers of the new bank, who, with one or two minor exceptions, were the officers of the old bank. On January 30, 1932, Abney, the president of both the old and the new Citizens' Banks, both of which had for a long time been pressing for payment of the notes, came before the board insisting that the notes it held be renewed. This was objected to by some of the members, particularly Tabor, on the ground that, while the college owed the bank the notes, the bank owed the college, on

account of deposits, sufficient to pay them. Abney replied that, while the Coggin Bank might have been liable, the Citizens' Bank was an innocent purchaser of the notes for value. He was supported in this by a bank examiner, who was then in charge of the liquidation of the old Citizens' Bank. One of the lawyers on the board, who had represented the Citizens' and the Coggin Banks and who was liable as a stockholder in the Coggin Bank, advised that the bank was not liable for the deposits except as shown on the books, as did another lawyer, a member of the board. Tabor, finding himself in a hopeless minority of one, and unwilling to agree to the claim of Abney that the college was liable on the notes without right of offset, resigned. The other members of the board, then faced with the necessity of standing suit or renewing the notes, some gravely doubting that it had, others concluding that it did not have, a claim against the bank, and desiring to avoid suit, decided to go against Gilliam for what it could recover there, and to renew and extend the notes. On March 2, as a part of this general plan decided on, it settled with Gilliam and released him, receiving from him property and notes together of the nominal value of $15,000. Thereafter, on March 13, the board definitely abandoned its claim against the bank and settled its controversy with it by executing new notes in extension and renewal of the old ones, including the Gilliam Independence fund note for $6,000. These notes it secured by a mortgage on college property, including that which it had just gotten from Gilliam, and by an assignment of the Gilliam notes. As a part of the settlement, the two $1,000 subscriptions to the college, made by the Coggin and the old Citizens' Bank, respectively, were credited on the notes. On January 10, 1933, the fate which had followed the predecessor banks overtook the new Citizens' Bank. It became insolvent, and Abney, its president, was appointed conservator. It is from the adverse decree in the suit he brought that the college prosecutes this appeal.

Over the notes themselves there was below, there is here, no controversy. The college admits outright that it is liable on all the notes, except the one for $6,000, and, as to that, it admits that, though it did not directly authorize the execution of the note, it was executed for its benefit, and it has had the benefit of the money obtained by it. There is, however, a real controversy over the college's counterclaim that the bank's liability to it for the Coggin deposits offsets its liability to the bank on the notes.

The plaintiff meets the counterclaim with the denial that, in taking over from the Coggin Bank, the old Citizens' Bank assumed or became liable for the deposit accounts of the college with the Coggin Bank, except as they were shown by the books of the Coggin Bank, and with the plea of bona fide purchase. It meets it, too, with pleas of waiver and estoppel by election and of release of the Coggin Bank by the settlement with, and release of, Gilliam, one of the two joint feasors. Finally it meets it with the plea that the college and the bank made a complete and binding settlement of all controversies between them in connection with and by the renewing and extension of the notes.

On the defenses of nonassumption and bona fide purchase the claim appellee advances is that such taking over from the Coggin Bank as there was was not by consolidation or merger, but by transfer carefully prepared, as to assets taken over and liability assumed, that the transaction was a purchase and sale of specific assets for the specific consideration named, the assumption of liabilities as shown on the books, and that in the purchase the Citizens' Bank acquired the college notes before maturity, for value, and without notice. On those of waiver and estoppel by election, appellee urges that when in January, 1932, the college was confronted with the choice of insisting that Gilliam's withdrawals were ineffective because unauthorized, and that the deposits in their full amount still stood to its credit, it elected to obtain a settlement with Gilliam, thus affirming the validity of the withdrawals, and therefore the nonliability of the bank.

On the defense of release by settlement with Gilliam, the claim is that, Gilliam and the bank having jointly wronged the college by misapplying its deposits, the release of Gilliam operated to release the bank too. Finally, its claim is that the college having, by an agreement, abandoning its greatly contested claim of offset, definitely compromised and settled its differences with the bank, obtaining thereby a credit of the two disputed subscriptions, a forbearance to sue and an extension of the notes, may not now, having renewed them with that understanding, rue back its bargain.

The college, citing First Nat. Bank of Duncan v. Staley (C. C. A.) 4 F.(2d) 324; Farmers' & Merchants' State Bank & Trust Co. v. Cole (Tex. Civ. App.) 220 S. W. 354;

Mobley v. Hagedorn Construction Co., 168 Ga. 385, 147 S. E. 890; Northwest Perfection Tire Co. v. Perfection Tire Corp., 125 Wash. 84, 215 P. 360, argues that here was not a purchase, but a consolidation or merger, that the Coggin Bank in fact, was merged into and with the Citizens' Bank of Brownwood, and that that bank took all its property liable for all its debts. It insists that the old Citizens' Bank became liable for its deposits, not as they appear on the Coggin's books, but as they in fact were. Answering the defense of waiver and estoppel by election to proceed against Gilliam, it cites Security Bank & Trust Co. v. Geren (C. C. A.) 288 F. 317, to which may be added Alexander v. Security Bank (D. C.) 273 F. 258; Commercial & Agricultural Bank v. Jones, 18 Tex. 811; Parkerson v. Borst (C. C. A.) 264 F. 761, 766; Standard Oil Co. of Ky. v. Hawkins (C. C. A.) 74 F. 395, 33 L. R. A. 739; Momsen-Dunnegan-Ryan Co. v. Helvering (App. D. C.) 68 F.(2d) 754. It declares that there was no election, for Gilliam was its agent and it had the right to go against both him and the bank until it got satisfaction without estoppel as to either by what it got from the other. The defense that the release of Gilliam released the bank it meets with the claim that the bank was liable in contract to return the deposits; Gilliam in tort for his wrongful conversion of them. Quoting from Corpus Juris, vol. 53, p. 1268, "The release of a claim ex contractu does not release an allied claim in tort, and the converse is likewise true" and citing First State Bank v. Shannon (Tex. Civ. App.) 159 S. W. 398; Frieders v. Frieders' Estate, 180 Wis. 430, 193 N. W. 77, 31 A. L. R. 118, it invokes that rule. It insists, too, that, considering the liability of both as sounding in tort, the release of one joint tort-feasor releases the other only when the intent to discharge the cause of action, and not merely the particular wrong-doer, clearly appears. El Paso & S. R. Co. v. Darr (Tex. Civ. App.) 93 S. W. 166. Finally, as to the settlement it made with the bank, its answer is that that was made without full knowledge of its rights, and in reliance upon the positive insistence of the bank that it had none. It cites and invokes cases on implied waiver, C. C. Mengel & Bro. v. Handy Chocolate Co. (C. C. A.) 10 F. (2d) 293; Goodwin v. Abilene State Bank (Tex. Civ. App.) 20 S.W.(2d) 1090; Culver v. Haggard (Tex. Com. App.) 270 S. W. 846.

■■ We think there is considerable to be said in favor of the point the college makes that the first Citizens' Bank did take over the assets of the Coggin Bank under circumstances making it liable for the deposit liability of that bank to the college, not as it appeared, but as it was. We think, too, that the authorities it cites sustain it on its point, that, since Gilliam was the agent of the college to deposit and to draw its funds for college purposes, there was no such inconsistency as to constitute an election merely in its looking to him as well as to the bank, for the return of its deposits. But it did not do this. What it did, if standing alone, would look dangerously like a complete election to pursue Gilliam only, turning its back definitely upon the bank. Cf. Alexander v. Bank (D. C.) 273 F. 258.

■ We do not think it necessary, however, to decide, we do not decide, whether the settlement it made with Gilliam would of itself have operated to discharge the plaintiff bank, for this was by no means all that occurred. Confronted with all these conflicting claims and contentions, the bank insisting on having its notes paid or renewed, the college claiming their discharge by offset, with the question of whether to proceed against Gilliam or the bank or both definitely before them, the college made a complete and conclusive election. It went on to Gilliam for what it could get from him, and followed this by renewing and extending the notes which it had just before claimed had been paid off by offset. In doing this it not only renewed the notes, but gave security for them, including that it had just gotten from Gilliam in the settlement with him. Thereafter they renewed the notes from time to time without in any manner advancing their claim to offset, until more than two years later, when this suit was filed. Such a settlement, thus voluntarily and completely made, binds the parties to it. Colt Co. v. Ellis (Tex. Civ. App.) 293 S. W. 629; Hunter v. Lanius, 82 Tex. 677, 18 S. W. 201; Twichell v. Klinke (Tex. Civ. App.) 272 S. W. 283; Enslen v. Mechanics' Bank (C. C. A.) 255 F. 527; Gaddis v. Chilton, 101 W. Va. 26, 131 S. E. 719; Pioneer Bank v. MacNab, 41 Idaho, 146, 238 P. 295; Farmers' & Merchants' Bank v. Parker, 150 Tenn. 184, 263 S. W. 84, 35 A. L. R. 1253, and note; Hatten Realty Co. v. Baylies, 42 Wyo. 69, 290 P. 561, 72 A. L. R. 587.

The judgment is affirmed.