## WICHITA ROYALTY CO. et al. v. CITY NAT. BANK OF WICHITA FALLS.

No. 12784.

Court of Civil Appeals of Texas. Fort Worth.

June 10, 1933.

Rehearing Granted Feb. 24, 1934.

Rehearing Denied May 11, 1934.

See, also, 36 S.W.(2d) 1057.

Kilgore & Rogers, J. T. Montgomery, John Davenport, T. R. Boone, Weeks, Morrow & Francis, and Arch Dawson, all of Wichita Falls, for appellants.

Bullington, Humphrey & King, of Wichita Falls, for appellee.

DUNKLIN, Justice.

This suit was instituted by the City National Bank of Wichita Falls against the Wichita Royalty Company, designated as a common-law trust, and against E. E. Scannell as its trustee, and against Scannell individually, to recover the balance due on a promissory note payable to the plaintiff bank executed by E. E. Scannell as trustee for the Wichita Royalty Company, on June 26, 1930, for the sum of $22,000, due 60 days after date, executed as a renewal and extension of original notes executed by the defendants to the plaintiff and secured by a deed of trust on oil royalties on land situated in Young county; also to recover $14,596 as one-half of the balance remaining due and unpaid on another note, of date June 9, 1930, in the sum of $43,000, executed by the Texas Investment Company, a corporation, and indorsed by the Wichita Royalty Company, by E. E. Scannell, trustee, and also by J. T. Harrell and J. A. Kemp. That note was secured by the pledge of 650 shares of capital stock of the Texas Investment Company, together with notes and accounts receivable. It was alleged that certain payments in money had been made on that note which were duly credited thereon and a further credit for collateral sold in the sum of $20,000, leaving a balance due of $29,192; and that the relative liability of the indorsers was one half to the Wichita Royalty Company, to wit, $14,596, and the other half jointly to the other two indorsers, J. T. Harrell and J. A. Kemp.

The trial judge instructed a verdict in favor of plaintiff for its alleged debt, and also as against defendant's cross-actions hereinafter noted; and, from a judgment in conformity therewith, defendant has appealed.

On June 20, 1930, R. R. Robertson, for the Wichita Royalty Company, executed an instrument in writing designated as a "Declaration of Trust," and in which he was named as trustee. That instrument contained the following provisions:

"First: That this Trust shall be designated and known as the Wichita Royalty Company, with principal office in Wichita Falls, Texas.

"Second: That the said Trustee shall hold all the funds and property now or hereafter held by or paid to, or transferred or conveyed to him or his successor or successors as trustee hereunder in trust for the purpose, with the powers and subject to the limitations hereinafter declared, for the benefit of the cestue que trustent (Hereinafter called the stockholders), and it is hereby expressly declared that a trust, and not a partnership or joint stock association is hereby created; that neither the trustee nor the stockholders shall ever be personally liable hereunder as partners or otherwise, but that for all debts the trustee shall be liable as such to the extent of the trust funds only. * * *

"Third: The general purposes of this company are to purchase and sell oil and gas royalties, and other oil and gas properties.

"Fourth: The capital stock of this trust shall be One Million Dollars ($1,000,000.00) divided into one million shares of par value of one Dollar ($1.00) per share.

"Fifth: The certificate of stock shall be issued and signed by the trustee, and shall be substantially in the following form, towit:

: " 'Wichita Royalty Company

" 'Wichita Falls, Texas

" '(A common law Trust)

" 'Members Certificate of Interest.

" 'This is to certify that ——— is the owner of ——— fully paid shares of beneficial interest in the Wichita Royalty Company, a common law trust, transferrable only on the books of the trust by the owner thereof in person or by duly authorized agent upon the surrender of this certificate properly endorsed.

" 'This certificate of interest is subject to the provisions and covenants contained in the Declaration of Trust of the Wichita Royalty Company, dated the first day of June, A. D. 1930, and any amendments thereto, and the by-laws of said trust, present or future, and the provisions hereof.

" 'No member of said trust, or owner or holder of this certificate, as such, shall have any authority, power or right whatsoever to do, or transact any business whatever for, on behalf of, or binding on the trust, or any member thereof, and no member of this trust shall be personally liable for any debts, covenants, demands, contracts of any kind or torts of this trust beyond the payments in full of the price of which his share or shares were sold to him by the trust.

" 'This certificate shall be the sole and only evidence of membership in said trust.

" 'Witness the signature of the trustee of said trust, this the ——— day of ——— 19—.'

\*    \*    \*    \*    \*    \*    \*

"Sixth: Stockholders in this trust shall have no legal right to the trust property or funds held from time to time by the trustee, as herein provided for, and especially shall have no right to call for any partition of the trust property or funds, or dissolution of this trust, but the shares shall be personal property carrying the right of division of the profits; and at the termination of said trust by expiration of the period fixed for its existence or dissolution otherwise, the stockholders shall be entitled to a division of the principal and profits in due proportion to the number of shares held by each.

\*    \*    \*    \*    \*    \*    \*

"Eighth: The entire affairs of this trust shall be managed by one trustee, who shall

own at least one certificate of membership for not less than one share. The Trustee may from time to time hire suitable offices for the transaction of the business of this trust; and he may appoint, remove or reappoint such officers, agents and other assistants as he may think best, define their duties and fix their compensation provided, however, that any person to be eligible to hold office of Vice-President, Secretary or Treasurer must be the owner and holder of at least one certificate of membership in this trust for not less than one share.

"The title to all property acquired or to be acquired from time to time by this trust, and all investments shall be made and held in the name of the Trustee as such trustee, or his successors or successor, in office. The trustee in his capacity as such may sue and be sued in any court of law or equity.

"The trustee shall have full and exclusive power and authority to conduct the business and affairs of this trust, to purchase, contract for, lease, or otherwise acquire, any property necessary or proper for the purpose of the trust; to sell and convey all or any part of the property of the trust; to borrow money on the credit of the trust; and, if he deems advisable to execute notes therefor secured by a mortgage or deed of trust upon the property of the company, and generally to do all things which in his judgment is necessary and prudent in the management and conduct of the business of the company; and he shall receive compensation commensurate with his services, to be determined by the officers and as provided by the by-laws.

"Any debt incurred by the trustee shall be charge on the property of the trust in preference to the claim or claims of any stockholder as such; the trustee is authorized in the conduct of the business, to sell in due course of business the property, real or personal, of the trust, free of any incumbrance whatsoever, provided of course that any mortgaged property shall be sold in conformity with the terms of the mortgage or deed of trust theretofore given.

"In the event the trustee should die, resign, refuse or become incapable to act as trustee, the Judge of the District Court of the Thirtieth Judicial District, comprising at present the counties of Wichita, Archer, and Clay, State of Texas, shall fill the vacancy created thereby by the appointment of a person qualified under this Declaration of Trust to act as trustee.

"The trustee may select a manager or managers for all or any part of the property or

business of the trust, and may employ such agents, servants and employees, fixing their compensation and entrusting them with such authority and the duties as he may deem wise; and the trustee may appoint or contract with any person, firm, corporation, joint stock association, trust or company as fiscal agents for the sale of the beneficial interests and shares, or may sell all or part of such shares to such fiscal agents upon such terms and conditions of sale as may be fixed by contract entered into by such fiscal agents and the trustee.

"The Trustee shall declare dividends from the net income of the trust quarterly, or oftener, and his decision as to the amount of dividends shall be final; provided, however, that at least once each year the total net profits arising from the operation of this trust shall be distributed among the stockholders in the ratio that the number of shares owned by each bears to the total number of shares then issued and outstanding.

"Tenth: The Trustee may adopt such by-laws in harmony herewith as he thinks proper. This Declaration of Trust and the by-laws so adopted shall be signed and acknowledged by the trustee in the manner required by the laws of the State of Texas for the registration of conveyances of real estate, to the end that the same may be recorded if it be deemed necessary or expedient.

❖ ❖ ❖ ❖ ❖ ❖ ❖

"Twelfth: The Trustee shall be responsible only for his own wilful and corrupt breach of trust, and not for any honest error of judgment.

"Thirteenth: No assessment shall ever be made upon the stockholders, nor shall they ever be personally liable in any event or have any rights hereunder except as provided herein.

"Fourteenth: At any (time) upon the expiration of twenty years after the death of the present trustee, R. R. Robertson, the trustee shall terminate this trust by dividing the trust property and funds among the stockholders, being first duly indemnified for any outstanding obligations or liability, and shall thereupon be forthwith discharged."

That declaration of trust was filed in the office of the county clerk of Wichita county and there recorded in the deed records of that county.

On January 2, 1923, R. R. Robertson tendered his resignation as trustee to Judge H. R. Wilson, judge of the Thirtieth judicial district, who thereupon appointed G. W. Peckham the sole trustee of the trust estate, to wit, the Wichita Royalty Company, with all the privileges, powers, and authority conferred by virtue of the declaration of trust.

The business of the Wichita Royalty Company was then continued by G. W. Peckham from the date of his appointment until his death, which occurred on November 7, 1929. E. E. Scannell was secretary and treasurer during the entire time G. W. Peckham served as trustee. On November 12, 1929, Judge Allen D. Montgomery, of the Thirtieth judicial district, appointed E. E. Scannell, of Wichita county, sole trustee of the Wichita Royalty Company to fill the vacancy caused by the death of G. W. Peckham, with all the rights, privileges, powers, and authority conferred by the declaration of trust. On the same day of his appointment, E. E. Scannell filed his written acceptance thereof, and thereafter conducted the business, and has continued as such trustee ever since.

The origin of the note for $22,000 sued on by the plaintiffs was as follows:

On January 18, 1926, G. W. Peckham borrowed from the bank on account of the Wichita Royalty Company the sum of $15,300, executing therefor the promissory note of the company; and on March 1st he borrowed $25,000 additional on the same account, and executed a note of the company therefor; and the amounts so borrowed were placed to the credit of the Wichita Royalty Company.

On November 25, 1929, after the death of G. W. Peckham, E. E. Scannell, the substitute trustee, executed a renewal note for $27,846, the balance then due on those two notes. Thereafter, Scannell as trustee executed a second renewal note for the balance then remaining unpaid; and on January 26, 1930, after payment of $6,000 on the second renewal, he executed a third renewal note for $22,000, and that third renewal is the one in that amount sued on by the plaintiff herein.

All of those renewal notes were executed in the name of the Wichita Royalty Company by E. E. Scannell, trustee.

The history of the other note described in plaintiff's petition for the principal sum of $43,000 and on which plaintiff sought a recovery for $14,596 is as follows:

On September 19, 1925, J. A. Kemp, W. H. Peckham, George W. Peckham, and J. T. Harrell purchased from the Highland Irrigation Company 51.59 acres of land which had been platted into a town lot addition to the city of Wichita Falls for the purpose of sale as town lots and designated as the "Marlboro Addition" to that city. The total consideration for that purchase was $61,908; of which amount

$15,577 was paid in cash and the balance evidenced by six promissory notes of the purchasers, each for the sum of $7,738.50, a lien being retained on the property to secure the deferred payments. Each of the four purchasers owned an undivided one-fourth interest in the addition, and on March 6, 1926, W. H. Peckham conveyed his one-fourth interest to Geo. W. Peckham, after which the latter owned an undivided one-half interest in the addition. On April 10, 1926, Geo. W. Peckham conveyed his one-half interest to the Wichita Royalty Company subject to the debts outstanding against it.

On August 28, 1929, J. T. Harrell, Geo. W. Peckham, and J. Will Gray procured a charter of a private corporation for the purpose of taking over the Marlboro addition and disposing of it as town lot property; the name of the corporation so chartered being the Texas Investment Company. The authorized capital stock was $25,000, divided into 250 shares of $100 each. On January 24, 1930, the charter was amended, increasing the capital stock from $25,000 to $75,000, divided into shares of $100 each. That amendment to the charter was procured by J. T. Harrell, J. Will Gray, and E. E. Scannell, who constituted a majority of the board of directors, and E. E. Scannell subscribed for one-half the increase of the stock, or $25,000, which was ordered issued to him as trustee of the Wichita Royalty Company. On March 17, 1930, another resolution was passed by the board of directors of the Texas Investment Company reducing the capital stock from $75,000 to $65,000, and at the same time a resolution was passed by the board of directors for the purchase of the Marlboro addition for a cash consideration of $65,000 and the assumption of all outstanding indebtedness against the addition, listing its liabilities, which included the note payable to the City National Bank for $43,500. E. E. Scannell was one of the board of directors and participated in that meeting. On September 30, 1929, G. W. Peckham, J. T. Harrell, and J. A. Kemp conveyed the Marlboro addition to the Texas Investment Company, and that conveyance was later ratified and confirmed in another deed executed by E. E. Scannell as trustee for the Wichita Royalty Company.

On June 9, 1930, the Texas Investment Company, by E. E. Scannell, its president, and J. Will Gray, its treasurer, executed its promissory note in favor of the City National Bank of Wichita Falls, Tex., for the sum of $43,000, with interest thereon at the rate of 8 per cent. per annum. The note was indorsed by J. T. Harrell, Wichita Royalty Company by E. E.

Scannell, trustee, and J. A. Kemp. It recited that collateral was deposited with the bank to secure the payment of the note or any note given in extension or renewal thereof; the collateral recited being "640 shares of stock of the Texas Investment Company, notes and accounts receivable, approximately $35,000.00." One-half of the balance remaining unpaid on the note after giving credit thereon for the amount realized from the collateral represents plaintiff's claim of $14,546 on the second note.

During the period beginning October 8, 1925, and ending November 12, 1929, Geo. W. Peckham drew 49 checks on funds deposited in plaintiff bank to the credit of the Wichita Royalty Company, aggregating the sum of $134,712.14, the checks being signed by him as trustee for the Royalty Company, and after his death seven additional checks were drawn on the same account by Scannell, the substitute trustee, aggregating $10,055.42; 45 of the checks drawn by Peckham, aggregating $119,473.98, were made payable to the bank, and 4, totalling $9,238.16, in favor of Peckham, personally, and for those 49 checks which he deposited he was given personal credit on the books of the bank. Some of those checks were given in payment of interest on the two notes theretofore executed in the name of the Royalty Company in January and March for $15,300 and $25,000, respectively. Others for investments in oil properties for the Royalty Company; and others aggregating several thousand dollars in favor of holders of the purchase money notes executed by Peckham and his associates for the Marlboro addition, and one for purchase of W. H. Peckham's interest in that addition. After Scannell succeeded Peckham as trustee, he also drew checks on the account of the Royalty Company which he applied as payments on the two notes of the Royalty Company executed in January and March, 1926, already noted, and two checks in favor of the Texas Investment Company to be applied on the loan made to that company by plaintiff bank.

Peckham also received credit on his personal account for $6,000 realized from oil investments belonging to the Royalty Company which had theretofore been deposited to his personal credit in the Security National Bank.

At the time Peckham procured the two loans by the bank to the Royalty Company evidenced by the two notes mentioned aggregating $40,300, he was indebted to the bank on his promissory notes in the sum of $28,000. The evidence showed that beginning October 8, 1925, and ending with the date of his death,

Peckham was personally indebted to the bank on his personal notes in varying sums, sometimes above $28,000 and sometimes below that sum, and amounting to $25,475 at the date of his death. He was insolvent at the date of his death, and left no estate out of which the demands asserted in the cross-action could be satisfied.

When Peckham executed the deed to the Wichita Royalty Company to the interest he had purchased in the Marlboro addition, he placed it with the papers in his office, and instructed E. E. Scannell, then the secretary and treasurer of the company and who had charge of the office, to tell no one of its execution. That instruction was obeyed until Peckham's death, but, after Scannell was appointed trustee, he, as trustee, asserted title under that deed for and in behalf of the Royalty Company, although in his cross-action he tendered a return of it, together with an offer to relinquish any claim of title thereunder. While he was secretary and treasurer of the company under the trusteeship of Peckham, Scannell kept the books of the company and had full knowledge of all the facts involved in Peckham's conduct of the business of the Royalty Company, including drawing checks and his investment in the Marlboro addition. He also made monthly reports to the 1,300 stockholders in the company residing in many other states and some in Canada with respect to the conduct of the business of the company, but never disclosed to them the action of Peckham in borrowing the $40,300 in the name of the Royalty Company, drawing checks against the account of the Royalty Company after depositing to its credit the amount so borrowed, the investment made by him in the Marlboro addition, and taking deed in his own name, and later executing his deed therefor to the company, with instructions to him not to disclose to any one knowledge of that instrument. Neither the bank nor any of its officers had knowledge of the failure of Scannell to keep the stockholders fully informed of those transactions and took no steps to convey such knowledge to them.

According to the testimony of Scannell on the trial, Peckham usually paid for oil royalties by checks drawn on his personal account, sometimes taking deeds therefor in his own name and then conveying them to the Royalty Company.

Notations on vouchers attached to the checks drawn by Peckham on his personal account for investment in the Marlboro addition, but separated and withdrawn when the checks were honored, although referred to on the faces of the checks, indicated that they were given for that purpose, although the checks were honored by the tellers of the bank and without knowledge of Harrell, its vice president, of such notations at the time the checks were honored.

The answer of defendant to plaintiff's suit on the $22,000 note included (a) want of consideration; (b) want of authority in the borrowing trustee to borrow for the purposes for which the same was made, which purposes were known to J. T. Harrell, vice president of the bank, who acted for the bank in making the loan and who personally profited therefrom; and (c) payment. As to plaintiff's alleged cause of action on the indorsement on the Texas Investment Company's note, the answer pleaded (a) non est factum; (b) want of authority on the part of the indorsing trustee to bind the trust by his indorsement; and (c) want of consideration.

Defendant's cross-action against plaintiff bank and against J. T. Harrell, its vice president, personally, was to recover $84,587.23 alleged to be the amount of funds belonging to the Wichita Royalty Company and misappropriated by Peckham and Scannell during their respective trusteeships for purposes not authorized by the declaration of trust, and principally for investment in the Marlboro addition. The deposits in the bank to the credit of the Wichita Royalty Company of the sums borrowed on the two notes executed in January and March, 1926, checks on the account of the Wichita Royalty Company by Peckham and Scannell as trustees during the period beginning October 8, 1925, and ending July 14, 1930, to whom given, and the purposes for which they were given, were all specifically alleged for purpose of an accounting, and as showing a misappropriation of trust funds.

It was further alleged that the uses so made of the trust funds were forbidden by the terms of the declaration of trust restricting its business to investment in oil royalties, and therefore the Royalty Company was not bound thereby; and that the bank and Harrell, with imputable knowledge of that restriction of authority and of the uses intended by the trustees at the time such funds were withdrawn, wrongfully participated in such misappropriation of trust funds in permitting the handling of the same in the manner so indicated, and in permitting the intermingling of trust funds with Peckham's personal funds in his personal account; and further that the bank and Harrell realized benefits from such misappropriation, and by reason of all which they were liable therefor.

To the cross-action the bank and Harrell, individually, pleaded laches, the statute of limitation of two years (Rev. St. 1925, art. 5526), ratification and estoppel; in response to which Scannell as trustee for and in behalf of the stockholders pleaded concealment from them by plaintiff and Harrell of the transactions complained of, repudiation thereof immediately upon their discovery thereof, and the filing of the cross-action immediately after such discovery.

The facts related above were all established without controversy, and it is our conclusion that they were of themselves sufficient to show misappropriation of trust funds in the first instance, by both Peckham and Scannell as trustees, and chiefly by Peckham. The question then is whether or not the evidence introduced was sufficient to support a finding by the jury, if they had been permitted to pass upon the weight of it, that the bank and Harrell, individually, were guilty of such a participation with either of the trustees, and especially Peckham, in such a manner as to render them liable for the tort jointly with the trustees. To support their contention of such liability, appellants rely upon the facts above related and many other facts and circumstances, a detailed statement of which would unduly lengthen this opinion. I believe it sufficient to give a general statement which will reflect the principal facts relied on as follows:

Permitting Peckham to pass to the credit of his personal account the two deposits aggregating $40,300, credited to the account of the Royalty Company from the two loans made to the Royalty Company in January and March, respectively, by checks drawn on such deposits by Peckham as trustee in his favor personally, at which time his account with the bank showed him indebted thereto more than $25,000. Testimony that the loan of $25,000 to the Royalty Company on March 1, 1926, was made to Peckham as trustee through J. T. Harrell, as vice president of the bank, who was Peckham's personal friend, and at which time Peckham's personal indebtedness to the bank evidenced by his personal note was more than $28,000, and as soon as that loan was made Peckham, by check on his personal account, paid to J. T. Harrell and C. E. Basham $5,060 owing to them arising from a joint investment with them in certain oil royalties from which Peckham realized a profit to himself which belonged to the company. Evidence that on March 1, 1926, the bank honored Peckham's check on his personal account for $11,811.85 in favor of W. H. Peckham, his brother, in payment for the fourth interest owned by that brother in the Marlboro addition. Testimony that Harrell was a banker of long experience and that he made no inquiry of Peckham as to what use the latter expected to make of the $25,000 at the time the same was loaned to the Royalty Company; Harrell testifying that such an inquiry is frequently made by a lending bank under like circumstances. Testimony that Harrell required Peckham to personally indorse the $25,000 note, although the Royalty Company was possessed of a good deal of property at that time, and owed no debts except the prior loan of $15,300; and further testimony of Harrell in answer to the question whether or not it was material to him "whether the trust account was carried in the name of the Wichita Royalty Company or G. W. Peckham," he saying it was "all alike to him," Harrell. Testimony that prior to the two loans made to the Royalty Company that company borrowed money to purchase oil properties, all of which was paid at maturity without renewal. Other testimony tending to show that, but for the $40,300 borrowed from the bank in the name of the company, he (Peckham) would have been unable to pay Harrell and Basham the $5,060 mentioned, and the amount paid W. H. Peckham, his brother, for the latter's interest in the Marlboro addition, and also unable to make all of his subsequent payments on the purchase-money notes given for the Marlboro addition. It is insisted that that evidence, in connection with the undisputed facts related above, was sufficient, prima facie, to show a collusive participation by the bank and Harrell, its president, with Peckham in the misappropriation of trust funds by using the same for purposes not authorized by the declaration of trust; notice of which was chargeable to the bank and Harrell.

The universal rule of decisions is that, if a bank carries on its books two accounts, one in the name of a trustee as such and the other in his name as an individual, it will be held liable to the cestui que trust for trust funds applied in payment to it of the personal indebtedness of the trustee to the bank. And, although the relation of the bank to the depositor is that of debtor and creditor, the deposit in favor of the trust is treated as a trust fund to the same extent as though the bank holds the money deposited in kind.

It is a further rule equally as well recognized that the bank will be held liable to the cestui que trust for trust funds misappropriated by the trustee in favor of persons other

than the bank if the bank has colluded with the trustee in such misappropriation under such circumstances as will constitute it a joint tort-feasor with the trustee.

The leading decision in this state is Interstate National Bank v. Claxton, 97 Tex. 569, 80 S. W. 604, 606, 65 L. R. A. 820, 104 Am. St. Rep. 885. In that case it appeared that Tamblin & Tamblin were live stock commission merchants in Kansas City engaged in selling live stock consigned to them as factors; they kept an account with the Interstate National Bank engaged in the banking business in Kansas City, and deposited in that bank the proceeds of all cattle sold by them as factors. Claxton, who resided in Texas, shipped cattle to them for sale, and the proceeds of the sale were deposited with the bank along with the proceeds of the sale of cattle of other owners. On October 28, 1901, Tamblin & Tamblin sold cattle belonging to Claxton and other parties, and realized therefor the sum of $4,529.65, of which amount $1,604.40 was the gross proceeds of the Claxton cattle. Payment for all those cattle were made by checks of the purchasers drawn in favor of Tamblin & Tamblin, and those checks were deposited in the bank and there credited to the account of Tamblin & Tamblin. On October 28, 29, and 30, 1901, Tamblin & Tamblin drew checks against the deposit in favor of the owners of cattle so sold other than Claxton's for the entire deposit except the sum of $160.-94, and failed to pay Claxton for his cattle, and the bank applied that balance to the payment of Tamblin & Tamblin's personal indebtedness to it. In an opinion by Justice Williams, Claxton was awarded a judgment against the bank for $160.94 so applied to the personal indebtedness of Tamblin & Tamblin, but denying Claxton any further relief. The evidence showed that, when the deposit of $4,529.65 was made, Tamblin & Tamblin were then insolvent, and their insolvency was known to the bank when they accepted it. In that opinion reference was made to the opinion in Commercial & Agricultural Bank v. Jones, 18 Tex. 811, in which the bank was held liable for money belonging to Jones and his partner Ufford, which had been consigned by them to George Dye and which Dye had deposited in the bank in his own name but for and on account of the owners of the money, with full knowledge on the part of the bank of such ownership. In that case the court said: "There was therefore a privity between the Bank and the plaintiffs, and the Bank became directly and immediately responsible to the plaintiffs, and not merely to the agent employed by the plaintiffs in making the deposit. Being so responsible, there can be no clearer proposition than that they had no right to pass the deposit to the private account of Dye. Whenever they did so, they were guilty of a fraudulent conversion."

Judge Williams in the Claxton Case referred to that opinion with this comment: "In that case the bank applied the money to its claim against Dye, and it was upon that ground that the liability was at last rested."

Judge Williams then held that the deposit in question by Tamblin & Tamblin of proceeds of sale of Claxton's cattle was with his full authority, and that the right of the bank to accept the same and place it to their credit and honor their checks thereon as was done was not affected by the known insolvency of Tamblin & Tamblin at that time. The court then proceeded to a discussion of the rules of law applicable to the relation existing between banks and their depositors, and we quote the following as showing the conclusions reached:

"We therefore hold that the deposit made by Tamblin & Tamblin was within their authority, and that they thereby became depositors; and the further questions must depend upon the rules of the law regulating the relation existing between banks and such customers.

"The principles governing are clearly stated in the opinion of the Chief Justice in the case of Coleman v. Bank, 94 Tex. 607, 608, 63 S. W. 867, 86 Am. St. Rep. 871, with copious citations from leading authorities. From these authorities it is clear that a depositor, although holding the money in a fiduciary capacity, may draw it out of the bank ad libitum. The bank is bound to honor his checks, and incurs no liability in so doing, as long as it does not participate in any misapplication of funds or breach of trust. The mere payment of the money to, or upon the checks of, the depositor, does not constitute a participation in an actual or intended misappropriation by the fiduciary, although his conduct or course of dealing may bring to the notice of the bank circumstances which would enable it to know that he is violating his trust. Such circumstances do not impose upon the bank the duty or give it the right to institute an inquiry into the conduct of its customer, in order to protect those for whom the customer may hold the fund, but between whom and the bank there is no privity."

And the court also cited section 317 of Moss on Banks and Banking.

I quote further from the Claxton Case as follows:

"This case is to be distinguished from those in which a bank undertakes to acquire title to, an interest in, or benefit from a fund held in trust by a depositor. In attempting to acquire such a right or benefit the bank becomes a party to the action of the trustee, and stands as any other person dealing with one holding property in a fiduciary capacity. The question of notice of the title of the person holding the property and his power over it arises, and a bank cannot, any more than any other person, acquire that which belongs in equity to another, if it have notice of his rights; and, if it thus aid a trustee in diverting trust property from the beneficiary, it becomes liable as a wrongdoer.

"Other cases to be distinguished are those in which a principal is the depositor, and occupies a contractual relation to the bank, but an agent is given authority to draw checks against the deposit for the benefit of the principal or of his business. In such cases the bank is not authorized to pay checks drawn by the agent for his own benefit if it knows, or, it is sometimes said, if it have good reason to know, the fact. It is mainly from expressions in opinions discussing these two classes of cases that the courts below reached the conclusion that it was the duty of the bank to avail itself of the means it had of knowing of the misappropriation of defendant's money by his agents. Wolffe v. State, 79 Ala. 201, 206, 58 Am. Rep. 590; Gerard v. McCormick, 130 N. Y. 266, 29 N. E. 115, 14 L. R. A. 234; Duncan v. Jaudon, 82 U. S. [15 Wall.] 165, 21 L. Ed. 142, 145; Central Nat. Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693; Union Stock-Yards Nat. Bank v. Gillespie, 137 U. S. 411, 11 S. Ct. 118, 34 L. Ed. 724; Duckett v. Bank, 86 Md. 400, 38 A. 983, 39 L. R. A. 84, 63 Am. St. Rep. 513; Union Stock Yards Nat. Bank v. Moore, 79 F. 705, 25 C. C. A. 150; Merchants' & Planters' Nat. Bank v. Clifton Manufacturing Co., 56 S. C. 320, 33 S. E. 750, 755.

"In other cases cited, money was deposited to the credit of one person, and drawn out by another without authority, and in still others the original deposits were held to have been wrongfully entered in the name of one who was not the owner of and not authorized to so deposit the fund. This case is distinguishable from all of those by the fact that the deposit was rightfully entered in the name of Tamblin & Tamblin, from which arose the power in them, which the bank was bound to recognize, of drawing it out by their personal checks. The principles laid down clearly make the bank liable for the sum applied to the debt of Tamblin & Tamblin. As to the sums paid out on checks, the most that is claimed is that the facts brought to the attention of the bank furnished it with the means of knowing that the money in question belonged to defendant, and that, in checking it out, his agents were misappropriating it. That, as we have seen, is not enough to make the bank liable further than stated."

In Coleman v. First Nat'l Bank of Waxahachie, 94 Tex. 605, 63 S. W. 867, 868, 86 Am. St. Rep. 871, a widow was denied a recovery of money belonging to her separate estate which had been deposited in bank by her husband to his credit and later drawn out and dissipated by him to the loss of the plaintiff. The evidence showed that her husband was a man of dissolute habits and unsafe to be trusted with his wife's money, and the bank, with full knowledge of that fact, allowed him to withdraw the money, and was therefore guilty of gross negligence. In that opinion, by Chief Justice Gaines, the following is said: "The principle applicable to bank deposits by trustees is thus stated by Mr. Justice Matthews in the case of Central Nat. Bank v. Connecticut Mut. Life Ins. Co., 104 U. S. 63, 26 L. Ed. 693, 698: 'A bank account, it is true, even when it is a trust fund, and designated as such by being kept in the name of the depositor as trustee, differs from other trust funds which are permanently invested in the name of trustees for the sake of being held as such, for a bank account is made to be checked against, and represents a series of current transactions. The contract between the bank and the depositor is that the former will pay according to the checks of the latter, and, when drawn in proper form, the bank is bound to presume that the trustee is in the course of law fully performing his duty, and to honor them accordingly.' This language was quoted with approval, and the principle applied, in the case of State National Bank v. Reilly, 124 Ill. 464, 14 N. E. 657. Again, in Freeholders of Essex v. Newark City National Bank, 48 N. J. Eq. 53, 21 A. 185, the court say: 'The contract arising by implication of law from a deposit of money in a bank is that the bank will, whenever required, pay out the money in such sums and to such persons as the depositor shall designate by his checks. The deposit is made to subserve the convenience of the depositor, with the understanding that he shall have the right to draw checks against it at his pleasure. And, even when it is known that

the money deposited is held by the depositor as a trustee, the bank is bound to presume, in the absence of knowledge to the contrary, that a check drawn against the money by the depositor has been drawn by him in the proper discharge of his duty as trustee, and to pay the check accordingly.'"

Further announcements to a like effect were also referred to. Quoting further from the opinion in the Coleman Case:

"The principle is that, since the trustee has control of the money, and has deposited it in the bank to be drawn out upon his checks, he has the right to draw for it, and the bank is not permitted to deny that right. When the beneficiary asserts his claim, and gives the bank notice, the rule does not apply. In the New Jersey case just cited the general rule was followed even as to the custodian of public funds.

"The principle does not allow the bank to collude with the depositor in a misapplication of the trust fund, nor does it permit the bank to apply the fund to the individual debt due to it from the trustee. Commercial & Agricultural Bank v. Jones, 18 Tex. 811. If such be the rule as to ordinary agents' and trustees, it certainly is the rule in this state as to the husband with respect to the wife's separate funds, of which, under our law, he has the 'sole management.' If the money had been deposited by the wife before her marriage, and the fund had remained in custody of the bank after that event, it would seem that he, as sole manager of her separate estate, and he alone, would have had the right to withdraw it. Clearly, therefore, having himself made the deposit with the understanding that it was to be drawn out upon his checks, the bank was bound to honor the checks so drawn. It was not charged with the duty of inquiring into the purpose for which each check was given. The fact that the husband was improvident in the use of money did not, under the law, detract from his authority as manager of his wife's separate estate, nor did it impose upon the bank an additional duty to guard her interest."

To the same effect are the following authorities: U. S. Fid. & Guar. Co. v. Adoue & Lobit, 104 Tex. 379, 137 S. W. 648, 138 S. W. 383, 37 L. R. A. (N. S.) 409, Ann. Cas. 1914B, 667; Steere v. Stockyards Nat'l. Bank, 113 Tex. 387, 256 S. W. 586, 258 S. W. 1042; Silsbee State Bank v. French Market Gro. Co., 103 Tex. 629, 631, 132 S. W. 465, 34 L. R. A. (N. S.) 1207; Perry on Trusts (7th Ed.) § 122, p. 177; article 7425b, Vernon's Ann. Civ. St.

The acts of the bank in giving credit to Peckham on his personal account for checks drawn by him as trustee on the account of the Royalty Company and later honoring checks drawn on his personal account for investment in the Marlboro addition, in which the bank acquired no interest, did not of themselves constitute a wrongful participation in the misappropriation of such funds, notwithstanding evidence tending to show that the bank had reason to believe that such investment was not authorized by the trust agreement. Especially so in view of the uncontradicted testimony of Scannell, who was secretary-treasurer of the Royalty Company at the time and thoroughly familiar with its affairs, to the effect that Peckham's custom was to use the two accounts as suited his convenience, buying nearly all oil royalties for the Royalty Company with checks on his personal account, sometimes taking them in his own name, then transferring same to the Royalty Company. Interstate National Bank v. Claxton, 97 Tex. 569, 80 S. W. 604, 65 L. R. A. 820, 104 Am. St. Rep. 885; Coleman v. Bank, 94 Tex. 607, 63 S. W. 867, 86 Am. St. Rep. 871; Childs v. Empire Trust Co. (C. C. A.) 54 F.(2d) 981, 984, and authorities there cited. See, also, notes to Empire Trust Co. v. Cahan, 57 A. L. R. page 925; also Bischoff v. Yorkville Bank, 218 N. Y. 106, 112 N. E. 759, L. R. A. 1916F, 1059, and authorities cited in the opinion in that case; and the forceful opinion of Justice Martin of the Amarillo Court of Appeals in Quanah, Acme & Pacific Ry. Co. v. Wichita State Bank & Trust Co. (Tex. Civ. App.) 61 S.W. (2d) 170, filed April 19, 1933; Maryland Casualty Co. v. City Natl. Bank (C. C. A.) 29 F. (2d) 662; Munnerlyn v. Agusta Savings Bank, 88 Ga. 333, 14 S. E. 554, 30 Am. St. Rep. 159.

The decisions cited above represent the views of the majority of the courts throughout the country, and I believe are founded on better reasoning, expressly recognized and followed by our Supreme Court in the Claxton and Coleman Cases and other cases of like character which in my opinion are controlling in this state. While other decisions of our state courts cited by appellants, upon first reading, may seem to adopt a stricter rule of liability of banks for trust funds deposited with them and later withdrawn and misappropriated by those acting in the capacity of trustees, yet they cannot be reasonably construed as announcing principles contrary to those made the basis of the Claxton and Coleman Cases and other cases following them; especially since those cases have been

cited with approval in many of the later decisions of our appellate courts. The Texas cases last referred to including the following: Bacon v. Wright (Tex. Civ. App.) 52 S.W.(2d) 1111; Moore v. Hanscom (Tex. Civ. App.) 103 S. W. 665; Id., 101 Tex. 293, 106 S. W. 876, 108 S. W. 150; First State Bank v. Shannon (Tex. Civ. App.) 159 S. W. 398 (writ of error refused); Miller & Co. v. Hobdy (Tex. Civ. App.) 159 S. W. 96; Pierce Petroleum Co. v. Guaranty Bond State Bank (Tex. Civ. App.) 22 S.W.(2d) 520; U. S. Fid. & Guar. Co. v. Adoue & Lobit, 104 Tex. 379, 137 S. W. 648, 138 S. W. 383, 37 L. R. A. (N. S.) 409, Ann. Cas. 1914B, 667. It might be added that many of those decisions are distinguishable from the Claxton and Coleman Cases by reason of different facts involved.

Appellants have cited many decisions of other states which seemingly would support their contention of liability of the bank in this case. However, I shall not undertake to discuss them, since at all events we must follow the established rule in this state. Among those cases are the following: Duckett v. National Mechanics' Bank, 86 Md. 400, 38 A. 983, 39 L. R. A. 84, 63 Am. St. Rep. 513; U. S. Fid. & Guar. Co. v. People's Bank, 127 Tenn. 720, 157 S. W. 414; Ducker v. Latonia Deposit Bank, 242 Ky. 374, 46 S.W.(2d) 493; Niagara Woolen Co. v. Pacific Bank, 141 App. Div. 265, 126 N. Y. S. 890; Tingley v. North Middlesex Savings Bank, 266 Mass. 337, 165 N. E. 119, and notes of many other decisions shown in L. R. A. 1915C, page 519. A later case cited by appellants is Robbins v. Passaic Nat'l Bank & Trust Co., 109 N. J. Law, 250, 160 A. 418, 82 A. L. R. 1368, with notes to that publication. In that case the bank was held liable to the owner of a check drawn to his order which his agent took to the bank for deposit to the owner's credit, and there had it credited to the personal account of the agent, who later withdrew the money and misappropriated it. In other decisions cited in the notes banks were likewise held liable for proceeds of checks payable to the order of the owners which agents of the owners took to the bank for deposit to the owners' credit and had the same deposited to their personal credit, later withdrawing and misappropriating the funds. Those decisions are manifestly distinguishable from the present case, in that the checks of owners so handled showed on their face that the agents had no authority to deposit them to their personal credit; while in the present case the trustees were vested with title and full control over all the trust funds; and one of the facts stressed in the decision in the Claxton Case was that trust funds belonging to Claxton had with his consent been deposited to the credit of his agents, Tamblin & Tamblin, who were employed to sell his cattle.

It is sufficient to say that, although the evidence in this case showed that the trustee Peckham misappropriated trust funds by using the same for the purchase of an interest in the Marlboro addition, which was not authorized by the terms of the declaration of trust, yet it was insufficient to support a further finding that the bank, through Harrell as its vice president and acting within the scope of his authority as representative of the bank, or Harrell individually, collusively participated with him in such diversion of the trust funds, or that either was chargeable with any obligation to the stockholders in the Royalty Company to prevent the same by refusing to honor his checks as trustee drawn on the deposits made to the credit of the company; some in his favor personally and some in favor of the bank, or in accepting those checks as credits to his personal account and thereafter honoring his personal checks on the same.

The evidence stressed by appellants in addition to the undisputed facts related above, to support their claim of Harrell's personal liability for misappropriation by Peckham, was the fact that he was severally liable as one of the makers of the Marlboro addition notes for the full payment thereof, which liability was reduced to the extent of such payments, coupled with testimony tending to show notice to him at the time Peckham's checks for investment in the Marlboro addition were cashed that they were to be so used and in possible violation of the trust agreement. Also evidence tending to show notice to him that in the joint venture between him and Basham and Peckham wherein Peckham used trust funds for the purchase of oil royalties and then conveyed the same to the Royalty Company for a profit to himself.

The full import of that evidence was to warrant a surmise or suspicion of wrongful collusion by Harrell with Peckham in a scheme by the latter to misappropriate trust funds, in spite of Harrell's positive testimony to a contrary effect, and therefore it amounted to no more than a scintilla of proof, which was insufficient as a matter of law to support the charge so made against him personally. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059; Garrett v. Hunt, 283 S. W. 489 (writ of error refused) and authorities there cited. See, also, Ft. Worth Belt Ry. Co. v. Jones, 106 Tex.

345, 166 S. W. 1130; Penn. Ry. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819; authorities cited above holding that payment of a check drawn by a trustee against a deposit in his name does not of itself show a participation in a misappropriation of funds so drawn from the bank. It has been often held that an action which is lawful within itself does not of itself become actionable even when it is prompted by an improper motive. Knowles v. Gary & Burns Co. (Tex. Civ. App.) 141 S. W. 189 (writ of error refused); Salado College v. Davis, 47 Tex. 131; 1 Texas Jurisprudence, p. 628, § 21; Pye v. Cardwell, 110 Tex. 572, 222 S. W. 153; Amuny v. Seaboard Bank & Trust Co. (Tex. Com. App.) 23 S.W. (2d) 287; 12 R. C. L. p. 237; 26 R. C. L. pp. 757 and 760.

To hold that the evidence was sufficient to sustain a finding that the bank and Harrell, individually, were guilty of a wrongful participation in the alleged misappropriation of trust funds would be to make them super trustees, with superior control over Peckham and Scannell as trustees, to the exclusion of powers expressly vested in them by the trust agreement, and without regard to the principle, "he who trusts most must lose most." And the very broad extent of the trust imposed in the trustees is evidenced by the stipulation in the twelfth article of the trust agreement, copied above. 17 Texas Jurisprudence, p. 53, § 52. Nor can it be said that Peckham's conveyance to the Royalty Company of the interest he acquired in his name in the Marlboro addition was ineffective for lack of a binding delivery, since, not only was delivery made to Scannell, the secretary and treasurer at the time, for the use and benefit of the company, but, after he became the duly appointed substitute trustee, he elected to claim title thereunder and to continue payments on the purchase money notes given therefor, and thereby waived any claim of lack of proper delivery, notwithstanding Peckham's instruction to him at the time of delivery to him not to disclose its execution to any one, and which request became ineffective after his death, at all events. And, since title to all trust property, together with authority to recover that which had been lost by suit in his own name and with exclusive management of the business of the trust, was all expressly vested in Scannell as trustee, that waiver was binding upon the stockholders in favor of the bank and Harrell. Equitable Life Assurance Society v. Ellis, 105 Tex. 526, 147 S. W. 1152, 152 S. W. 625.

It is to be noted further that there was no privity of contract between the bank and the stockholders growing out of the deposits to the account of the Royalty Company, since under the express terms of the declaration of trust title to all the funds of the Royalty Company was vested in the trustee; the stockholders having no rights except to share in the profits arising from the handling of the properties by the trustee and with no right to share in the principal until the trust is terminated by expiration of the period fixed for its duration, or its dissolution in some other manner—neither of which contingencies has yet happened.

The bank accounts introduced in evidence show deposits credited to Peckham's personal account during the period in controversy in the aggregate sum of $511,130, and deposits credited to the Royalty Company in the aggregate sum of $149,196.43, with debits made against each of those accounts evidenced by a large number of checks, aggregating many thousands of dollars. Although there was a plea, in general terms, of payment by the Royalty Company of the notes sued on by the bank, yet there was neither pleading nor evidence that funds belonging to the Royalty Company and deposited to its credit were in fact applied to payment of those notes further than as shown by some of the checks upon which the cross-action was based. Scannell, who was secretary-treasurer of the Royalty Company during that period, keeping the books and being thoroughly familiar with its affairs, did not undertake to testify that this was in fact done. On the contrary, as recited above, he testified that it was Peckham's custom to use both accounts in handling the affairs of the Royalty Company; usually paying for oil royalties by checks drawn on his personal account. To sustain the plea of payment, it would be necessary to hold that the deposits so made automatically liquidated the notes; and the writer is unable to so conclude.

Most of the 57 checks on which the cross-action was based were made payable to the bank while others were made payable to Peckham, but all of them were given in payment for oil royalties, investments, and improvements in the Marlboro addition and as payments on outstanding promissory notes, and they were all so applied. The checks so given for investments and improvements in the Marlboro addition and covering one-half of the total amount of such investments aggregated $55,719.44. The checks applied to investments in oil royalties and oil properties

aggregated $57,240. Thirty-three of the checks were given as payments on promissory notes, of which 26, aggregating $23,751.75, were drawn by G. W. Peckham, and 7, being Nos. 856, 880, 890, 898, 908, 920, and 930, aggregating $10,055.42, were drawn by Scannell as trustee after Peckham's death. Some of the checks so given by Scannell were applied on the Royalty Company's notes to the bank given for the two loans above mentioned, and the rest as payments on the Marlboro addition notes; 19 of the checks drawn by Peckham were likewise applied as payments on the same notes; but 7 of them, being Nos. 584, 620, 628, 635, 650, 657, 710, aggregating $10,750, were credited on the books of the bank as payments on Peckham's personal notes. The evidence showed that prior to the date of check No. 584 Peckham had paid to the Royalty Company $500 to be applied on the Royalty Company's note to the bank. And the books of the Royalty Company showed that Peckham had been given further credits on his account with the company as follows: August 31, 1927, for $500 to be applied on the company's notes to the bank; October 9, 1927, for $1,336; November 25, 1927, for $1,500 to be used in payment of the Royalty Company's note to the bank; and February 15, 1928, for $3,485. Those five items aggregate $7,321, and, if it be said that the seven checks show payments to the bank of trust funds on Peckham's personal debts to the bank, then, as insisted by the bank, we believe there should be deducted therefrom $7,321 shown above, leaving a balance of $3,-429 only.

Whether or not on the cross-action those seven checks or at least that balance of $3,-429 was chargeable to the bank as trust funds received by it on Peckham's personal indebtedness, with right of appellants to recover therefor, it is unnecessary for us to decide, since it is my conclusion that, at all events, appellant's demand therefor was barred by the statute of limitation, hereinafter discussed.

Furthermore, the lack of authority of trustee Peckham to place trust funds to his personal credit in the bank and then withdraw the same for investment in the Marlboro addition and take title thereto in his own name was waived by E. E. Scannell, the trustee, by his acts in ratification thereof indicated above, with full knowledge of all the facts relied on by the appellants to support their action to recover therefor, and that he, as the legal and exclusive owner of title to the funds of the Royalty Company, and vested with the right and powers expressly stipu-lated in the trust agreement, had full authority to bind that company and also the 1,300 stockholders in it by such waiver. Equitable Life Assurance Co. v. Ellis, 105 Tex. 526, 147 S. W. 1152, 152 S. W. 625.

Moreover, the cross-actions against the bank and Harrell were both barred by the statute of limitation of two years pleaded thereto, since the evidence showed that more than two years elapsed after the transactions on which the same were based occurred before the filing of the cross-action on February 14, 1931. The theory upon which appellants sought to avoid that defense was that, by reason of the receipt by the bank of funds belonging to the Royalty Company and deposited to its credit, it became a trustee of the funds wrongfully withdrawn and misappropriated by the trustees, and therefore the bar of limitation did not begin until a demand was first made for those funds by the filing of the cross-action. If such a trust was created, it was a resulting or constructive trust only, and therefore subject to the statute of limitation of two years as against the trustee holding legal title to the trust funds and every right of action belonging to the trustee and in which the stockholders had an equitable interest, with exclusive authority under the express terms of the trust agreement to institute suit therefor in their own names. Nor was the operation of that statute against the cross-action instituted in behalf of the stockholders suspended by reason of appellants' further contention that the misappropriation of funds was fraudulently concealed from them until the institution of the cross-action, which was well within two years after they discovered it, since the evidence conclusively shows that neither the bank nor Harrell was guilty of the alleged concealment, or was charged with the duty in law or equity to ascertain the names and addresses of the 1,300 stockholders and notify them of such disposition of the funds by Peckham. If there was such concealment or wrongful failure of any one to notify the stockholders of such misappropriation of trust funds, then the two trustees and Scannell, as secretary-treasurer under Peckham and who made regular reports to the stockholders of the business transacted by the trustees, were alone chargeable. And, according to Scannell's testimony, his cross-action in behalf of the 1,300 stockholders was in fact filed and prosecuted upon his own initiative in his own name and without the knowledge of the stockholders. Furthermore, the right of action for any misappropriation of trust funds accrued as soon as the same

occurred; and, under express terms of the declaration of trust, even Peckham himself as trustee could have sued at any time to recover for such as he had misappropriated. Indeed, the right to bring suits for benefit of the trust was vested exclusively in the trustee by the trust agreement. And the amount which Scannell sought to recover on his cross-action for the use of the stockholders included sums paid out by himself on the Marlboro notes after he was appointed trustee, as well as the amount misappropriated by Peckham for the same investment. The following is quoted from 1 Perry on Trusts (7th Ed.) § 122: "The trustee may also recover the funds notwithstanding his own fraud."

Nor have appellants presented any complaint in behalf of the stockholders that the failure of Scannell to sooner seek recovery of damages claimed in the cross-action was prompted by fraud on his part and participated in by the bank. The only excuse pleaded as a reason for such failure consisted of facts alleged to show that he was guilty of no negligence in failing sooner to sue; but such facts were insufficient to arrest the bar of limitation.

The authority of the trustee to institute such an action was as full and complete as that of a corporation, to the exclusion of any right in the stockholders to institute the suit in their own behalf, especially in the absence of a wrongful refusal of the corporation or trustee to sue. That power in the trustee was not restricted by the general rules governing the relation of principal and agent. American Bonding Co. v. Fourth Nat'l Bank, 205 Ala. 652, 88 So. 838; Kennedy v. Baker, 59 Tex. 150; Cole v. Noble, 63 Tex. 432; Collins v. McCarty, 68 Tex. 150, 3 S. W. 730, 2 Am. St. Rep. 475; Bates v. Preble, 151 U. S. 149, 14 S. Ct. 277, 38 L. Ed. 106. There is no merit in the further contention that limitation did not begin until the institution of the cross-action, on the theory that that was the first authorized demand for the funds belonging to the Royalty Company and deposited in the bank, and wrongfully withdrawn by Peckham, since the trustees could not postpone the beginning of the period of limitation by failing to sooner make a demand of the bank for payment of trust funds theretofore so withdrawn, after knowing of the same, especially as did Scannell, according to his own testimony.

In the absence of any competent evidence to show fraudulent participation by the bank or Harrell with Peckham in the misappropriation of trust funds, the statute of limitation

of four years has no proper application in this case.

For the reasons indicated, it is the opinion of the writer that the errors, if any, in the exclusion of testimony complained of in other assignments, were harmless; and that all assignments of error should be overruled and the judgment of the trial court, from which this appeal has been prosecuted, should be affirmed, leaving undisturbed the judgment that the bank recover nothing on its plea over against E. E. Scannell, J. T. Harrell, and W. H. Peckham, individually, and against Flora A. Kemp and Charles Q. Francis, independent executors of the estate of J. A. Kemp, deceased, and against W. H. Peckham as independent executor of the estate of Geo. W. Peckham, deceased, of which no complaint is made here.

LATTIMORE, Justice.

The appellee bank sued upon two notes, one for $22,000, which was a renewal of two earlier notes executed by Peckham, deceased, and the other for $14,596, which was a re-renewal of one for $43,000 executed by Peckham, deceased. The history of those notes will be hereinafter set out.

The appellant answered, setting up both by defense and cross-action that the notes were a part of lengthy transactions pleaded by which appellee negligently made possible and corruptly participated in transactions by which Peckham embezzled and spent unlawfully more than $100,000 of appellants' trust funds, and impleaded appellees Harrell and Basham, who were active officials of the appellee bank, alleging their personal and official participation in such misappropriation.

Peckham was a trustee under a declaration of trust of the Wichita Royalty Company, an unincorporated concern, filed in the deed records of Wichita county, where all these interested parties resided. That instrument declared that it was "the general purpose of this company to purchase and sell oil and gas royalties and other oil and gas properties"; that the trustee should have "entire management of the affairs" of the company; that title to all assets of the trust should be carried in the name of the trust; that the trustee should not be liable for his acts thereunder except for willful and corrupt breach of trust; that the officers of the trust should fix and pay Peckham's compensation for his services as trustee. That salary was fixed at $5,000 per month, and paid regularly, and is not included in any of the transactions hereinafter mentioned.

A jury was impaneled, and the court, after hearing the evidence, the pertinent portions of which will be below detailed, instructed a verdict for appellees and against the appellant trust.

It is important to bear in mind that this was an instructed verdict in the trial court, for I shall have numerous occasions to refer to the fact issues raised for the jury's determination, which, as far as we are concerned, must under such instructed verdict be found conclusively against appellees, and I shall so recite.

Let us first fix clearly some fundamentals which run through all the transactions:

(1) Peckham was as trustee merely the managing partner of Wichita Royalties. This was early announced by Mr. Justice DUNKLIN. See Thompson v. Schmitt, 115 Tex. 53, 274 S. W. 554. As such he was the agent of the other owners of beneficial interests in the trust, and, as said in the above-cited opinion, "all authority they possessed was delegated to them by" that declaration of trust "powers of attorney and similar instruments are to be strictly construed," and "authority delegated is limited to the meaning of the terms on which it is expressed." Skaggs v. Murchison, 63 Tex. 353.

(2) Harrell, as active and authorized representative of the appellee bank, as a matter of law, knew the state of Peckham's personal affairs with the bank as well as such state of the Wichita Royalty Company affairs with that bank.

(3) The bank as a matter of law knew whatever Harrell or Basham, as its active vice presidents, learned in the performance of their duties as such officers.

(4) Harrell and Basham knew that Peckham was such trustee, and must at their peril inquire into his authority to have the various transactions he did as trustee have with the bank.

Now it therefore seems that the judgment should be reversed for one or all of three reasons:

(1) Peckham used a large sum of the trust funds to pay his personal obligations to the appellee bank and to Harrell and Basham, officials of the bank. Counsel for appellees in their briefs practically admit that same was slightly more than $7,000. Appellant contends it was more than $57,000. We shall not attempt to reconcile that difference. If Peckham took another's money, and with it paid an antecedent debt to the bank, the bank must return the money. Its innocence is no defense, for it has parted with nothing therefor. Peckham personally owed the bank before he embezzled those funds, and, the bank returning the money to the rightful owner, Peckham still owes the same to the bank. I know of no authority which holds to the contrary. Even in Interstate Nat. Bank v. Claxton, 97 Tex. 569, 80 S. W. 604, 606, 65 L. R. A. 820, 104 Am. St. Rep. 885, relied on so strongly by appellees, in which the court absolved the bank of liability for a depositor's misappropriation of trust funds to the payment of personal debts of the depositor to strangers, the liability of the bank to return to the cestui que trust such of said funds as the depositor had paid to the depository itself on personal debts of the depositor is upheld. In the Claxton Case that doctrine, as expressed in Commercial & Agricultural Bank v. Jones, 18 Tex. 811, was expressly upheld. "In that case the bank applied the money to its claim against Dye (the trustee), and it was upon that ground that the liability was at last rested," and again "in attempting to acquire such a right or benefit the bank becomes a party to the action of the trustee, and stands as any other person dealing with one holding property in a fiduciary capacity." And in Coleman v. Bank, 94 Tex. 608, 63 S. W. 867, 869, 86 Am. St. Rep. 871: "The principle does not allow the bank *. * * to apply the (trust) fund to the individual debt due to it from the trustee." This same rule was said to require inquiry by the bank as to what funds were trustee funds before appropriating them to its own benefit; where the account contained commingled trust and personal money. Steere v. Stockyards Nat. Bank, 113 Tex. 387, 256 S. W. 586, 258 S. W. 1042. As against an instructed verdict, this last holding alone makes the judgment in our case erroneous, for inquiry would undoubtedly have shown facts as below set out to make at least a jury issue of knowledge of the misappropriation, if not establish it conclusively.

In the second place, over $100,000 of the embezzlement was done by this means: Peckham as trustee drew a check upon trust funds in appellee's bank and payable to appellee bank, and at his request and upon presentation of such check the bank withdrew the amount thereof from the Royalty Company's trust fund deposit, marked the check "paid," and placed such amount to Peckham's personal account, from whence Peckham expended the same for other than proper trust purposes and a part for personal financial adventures. At least it is undisputably so as to a substantial portion thereof, and an issue of fact as to the

balance is made which, as to this appeal, amounts to the same thing.

At this point we consider Robbins v. Passaic Nat. Bank & Trust Co., 109 N. J. Law, 250, 160 A. 418, 419, 82 A. L. R. 1368, and cases cited in notes thereto. In that case a managing partner procured checks drawn on the partnership account to the order of depository bank as payee, which checks were at the request of the managing partner cashed by said bank and placed to the personal account in said bank of the said partner, who thereupon dissipated same in his private enterprises. The court said: "There can be no doubt that as a fundamental proposition of law a check drawn to the order of a bank precludes the diversion of the proceeds of such check to a use other than that of the drawer, and such diversion can only be justified by the proof of authority from the drawer to so divert. * * * It is equally well settled that a partner may not use partnership funds for his private uses without the sanction of his co-partners." It is thus apparent that Peckham was without legal right to thus misuse the funds. Nor is it any answer to say that this was only an instrumentality used by Peckham which he could have accomplished by making as he did the checks payable to himself, in which event the bank would not have been privy to the transaction. It is sufficient to say that it was not done that way. If one aids another to embezzle, it is no answer to the former's guilt to offer proof that some other person or means was as available to accomplish the deed as the accused.

Moreover, each of these checks had printed thereon "endorsement of this check constitutes full receipt for the items shown on the accompanying voucher." Those vouchers (which Peckham removed before the check was delivered to the appellee bank) carried notations, some of them false, others showing improper uses, and some of them showing that the proceeds of the check was to be used to pay obligations of the appellant trust to the payee bank. Thus the bank was notified that this money was delivered to it for a trust purpose shown on accompanying voucher. We can at least say, and we need say here no more, that it was the duty of the bank to seek that information and ascertain why this check of known trust funds was payable to the bank when the bank was not in fact receiving the proceeds, and when by the check it was admitting full receipt for something shown on another paper, which was supposed to, but did not, accompany the check. It has been held in this state that, if one accepts and cashes a check insufficient to pay in full a disputed

amount with a notation thereon that same is in full payment, same is full payment. First State Bank v. Knapp (Tex. Civ. App.) 3 S.W. (2d) 468. If in such case the notation is notice, I fail to see why it would not be notice in this case. In the Robbins Case, supra, the question of negligence in not inquiring what the notation on the check meant, though not on the same facts, was submitted to the jury, and such submission was held to be proper.

The checks were payable to the bank, and it thus is privy to the transaction. This issue of privity to the transaction is also vital, and, if privity is found, is conclusive under the decisions of our Supreme Court. In the Jones Case, supra, Judge Wheeler said: "There was therefore a privity between the Bank and the plaintiffs (Wichita Royalty Company) and the Bank became directly and immediately responsible to the plaintiffs, and not merely to the agent employed by the plaintiffs in making the deposit. Being so responsible, there can be no clearer proposition than that they had no right to pass the deposit to the private account of Dye." I am aware of the explanation of the decision in the Jones Case as made in the Claxton Case, but the above statement of the law is not challenged. On the contrary, Judge Williams in the Claxton Case said: "We make these quotations, not for the purpose of questioning the soundness" of the Jones Case, but to differentiate.

In the Claxton Case the portion of the case which was reversed was the attempt of the trial court to hold the bank liable merely because the trustee, who had authority to carry the trust funds in his private account, had paid same out for nontrust purposes without knowledge or aid of the bank, and at the time insolvent. In our case, on the contrary, Peckham was expressly ordered by the terms of the trust agreement to carry all the trust property in the name of the trustee "as such trustee." Moreover, the rule applicable to our case is recognized in that opinion. The bank "incurs no liability in so doing, as long as it does not participate in any misapplication of funds or breach of trust." Again: "This case is to be distinguished from those in which a bank undertakes to acquire title to * * * a fund held in trust by a depositor. In attempting to acquire such a right or benefit the bank becomes a party to the action of the trustee, and stands as any other person dealing with one holding property in a fiduciary capacity. The question of notice of the title of the person holding the property and his power over it arises, and a bank cannot, any more than any other person, ac-

quire that which belongs in equity to another, if it have notice of his rights; and, if it thus aid a trustee in diverting trust property from the beneficiary, it becomes liable as a wrongdoer." The following authorities announce liability on facts showing knowledge of the transfer of the funds to the private account of the trustee without the bank actively participating therein other than honoring the checks drawn to accomplish the transfer: Bacon v. Wright (Tex. Civ. App.) 52 S.W.(2d) 1111; U. S. F. & G. Co. v. Adoue & Lobit, 104 Tex. 379, 137 S. W. 648, 138 S. W. 383, 37 L. R. A. (N. S.) 409, Ann. Cas. 1914B, 667; First State Bank v. Shannon (Tex. Civ. App.) 159 S. W. 398; Moore v. Hanscom, 101 Tex. 293, 106 S. W. 876, 108 S. W. 150.

This brings us naturally to a consideration of those checks which were made payable to the bank, by the bank cashed and the money placed by the bank to Peckham's personal account, and by which checks the bank agreed as per notation on check that same was full receipt for items on "accompanying voucher," which vouchers had been previously detached and were in the office of Peckham, and which vouchers stated that the checks were for various payments on the Marlboro addition. Marlboro addition was well known by the bank to be a promotion enterprise by which Harrell, a vice president of the bank, with Peckham and others, were paving and otherwise laying out same to sell to the public for residence purposes and not connected in any way with the oil business. Laying aside for the moment whether the bank believed the enterprise as far as Peckham was concerned to be that of the Wichita Royalty Company, the bank, in participating in this division of funds by receiving the money by checks payable to itself and that, contrary to the face of the check, placing it in Peckham's personal account, must face the question of whether the trustee could lawfully engage in such enterprise. The trust agreement, which was Peckham's agency contract, says that the general purpose of this company is to engage in the oil and gas business. That Peckham had no authority to so spend the money on Marlboro addition would be no grounds for recovery unless the bank had, as above stated, actively participated therein. But the bank did participate in such, and by such participation in such diversion the bank assumed the duty under the cases above cited to see that such funds were devoted to trust purposes.

This brings us to the third cause of reversal, to wit, that a jury issue is made that the bank had actual knowledge of Peckham's embezzlement and plans therefor, and in that connection the discussion will also show that at least a jury issue is made of the bank's knowledge that such Marlboro addition promotion was not an oil and gas business, as above limited by the declaration of purpose.

On September 19, 1925, Peckham and Harrell and others purchased 51 acres of land which they platted in this town lot addition. Peckham's one-fourth share of the cash payment was $4,733. When Peckham later made a charge on the books of the trust for this, he set it up at $11,811. In January, Peckham, trustee, issued a check to the bank; the voucher notation showing it was for "Stephens Royalty" purchase, and at his request the bank placed the money to his personal account. In January, Peckham, Harrell, and others bought 6 acres more adjoining the 51-acre tract. In March, 1926, the property required expenditures for gas, water, lights, paving, etc. In March, Peckham, as trustee for the Royalty Company, borrowed $25,000. That day Peckham issued his personal check for $11,811 to purchase another one-fourth in the addition. This was to Peckham's brother for an interest which cost the brother $4,723. Five days later Peckham, trustee, issued a check to the bank as payee amounting to $17,623, notation on voucher "Marlboro purchase," and the bank at his request cashed the same and placed the proceeds to his personal credit. Without such deposit, Peckham had on deposit $341. After such deposit, that $11,811 was paid and also a $5,060 check to Harrell and Basham, officers of the bank, in another transaction I shall discuss later. Thus we have the bank undertaking to see that the trust funds in such check were devoted to Marlboro purchase and allowing it to be used to pay Peckham's debt to one of the bank's officers.

More than a month later Peckham executed a deed of his one-half interest in Marlboro addition to the Wichita Royalty Company, handed it to Scannell, the office manager, with instructions and intent that same should be kept subject to his (Peckham's) will at all times and be destroyed and not effective if Peckham desired it, and should be kept a secret. This document was never made public during Peckham's lifetime. Peckham rendered the property and treated it as his own, told all who inquired that it was his own. He later individually joined in obtaining a charter for a corporation to take over the addition, transferred his share to the corporation, and personally joined indi-

vidually in borrowing money with the other title owners to pay the capital stock. The set-up on the books of the Wichita Royalty Company and the notations on the vouchers of the checks to the bank showed to Harrell and the bank that Peckham was charging the trust a profit over that which Harrell, the official of the bank handling the Wichita Royalty Company transactions with the bank, knew Peckham paid for the interest in Marlboro. Thereafter Peckham issued trust checks to the bank in the sum of $31,-000, voucher notations showing cost of improving Marlboro, which checks were by the bank cashed and the proceeds placed to the personal account of Peckham when the bank knew through Harrell that in fact the cost of those improvements to Peckham was only $25,000. Harrell testified he never knew that Peckham claimed this Marlboro adventure was for the benefit of the trust.

Now we think the above last three paragraphs at least makes a jury issue as to whether the bank had actual knowledge of the fact (1) that Peckham was not in fact conducting this real estate adventure for his trust as against merely using its funds intending to take the benefits individually; (2) that Peckham was in fact charging the trust falsely a profit on the expenditures he made of its funds.

We thus conclude that, as to the checks made payable to the bank and by the bank diverted to Peckham's personal account, a portion of those proceeds are shown conclusively to have been embezzlements on their face and the balance (Marlboro) were without authority and at least raise an issue of fact regarding the bank's liability (1) for the illegal profits of G. W. Peckham therein and (2) whether any of the residence real estate adventures (a) were within the scope of Peckham's authority and such want of authority known to the bank, (b) actually were being conducted as such, trust for trust purposes.

This brings us to the third reason for reversal which we referred to above, the payment to Harrell and Basham, two officers of the bank, from Peckham's personal account out of funds of the trust put there by the bank of its own volition. The Stephens royalty was owned by Harrell and Basham, both active officers of appellee bank. On November 9, 1925, Peckham bought one-half of this royalty at a price of $22,407. On January 18, 1926, Peckham, as trustee for the Wichita Royalty Company, borrowed from the bank, acting by Harrell, the same owner above named, $15,000. On the same date Peckham, trustee, issued a check to the bank for $15,769 payable to the bank. The bank cashed the check and placed the proceeds to Peckham's individual account. Without that deposit Peckham's personal account balance was $1,084. Harrell as a matter of law knew this. The voucher of the said check stated it was a balance on $25,769, purchase price of only one-fourth of the Stephens royalty, two checks of $5,000 each having been previously issued by the trust, one of them also payable to the bank with voucher notation of royalty purchase. One week later, January 25, 1926, and before Peckham had made any other deposit, Peckham issued his personal check to these two bank officials, Harrell and Basham, for $10,028, part payment on Stephens royalty. Harrell and Basham, and the bank through them, must be said to have thus actively participated with actual knowledge in Peckham's making an unlawful profit of $3,362 by the bank's cashing that check and putting it in Peckham's personal account. Again, on March 1, 1926, as above stated, Peckham as trustee borrowed $25,-000 from the bank through Harrell. As trustee, Peckham issued on March 6th a check for $17,623, payable to the bank, with a notation on the voucher therefor that same was a Marlboro purchase. The bank collected this check and placed the same to the credit of Peckham individually. But, for that deposit, Peckham's individual balance would have been $134. On that day Harrell and Basham, knowing these things as a matter of law, or as we must assume, on an issue of fact, took from Peckham his personal check for $5,060, and, cashing same, obtained for themselves this fund directly known by them to be trust funds and funds known by Harrell to be placed by this bank in Peckham's personal account on pretense of paying for Marlboro addition. Now we note that this information came to Harrell in his capacity as officer of the bank. However, this court, speaking through Chief Justice Conner, quoted the following: "When a bank officer is acting as a president or director of another concern, * * * the knowledge acquired in the latter capacity is imputed to his bank according to the most general rule." Gaines v. First State Bank (Tex. Civ. App.) 28 S.W.(2d) 297, 300, affirmed 121 Tex. 559, 50 S.W.(2d) 774. The rule thus broadly stated charges the bank with Harrell's individual knowledge that Peckham was making an unlawful profit on his sale of the Stephens royalty to the Wichita royalty when Harrell and Basham made a deed of part of said royalty direct to the Wichita Royalty Company and

at Peckham's direction, reciting a consideration greater than was actually paid to Harrell and Basham, and which unlawful profit Peckham was.able to divert to himself without exciting suspicion by making the trust check to Harrell and Basham's bank and procuring that bank to put the proceeds in Peckham's personal account.

As applicable both to the second and third reasons, is the case of U. S. Fidelity & Guaranty Co. v. Adoue & Lobit, 104 Tex. 379, 137 S. W. 648, 138 S. W. 383, 384, 37 L. R. A. (N. S.) 409, Ann. Cas. 1914B, 667. Compton as guardian had a certificate of deposit for about $12,000 from Adoue and Lobit, bankers. He individually owed the bank $7,000. He delivered this certificate to the bank with instructions to deposit it to his own account. This the bank did, and was repaid its $7,000. Compton thereupon paid another personal debt with the $5,000 balance. On motion for rehearing, the bank insisted that it was not liable, since it was admitted that the bank had no suspicion that the guardian was embezzling the trust funds, that it should not be required to return the $7,000 it had received, and especially the $5,000 Compton had paid to other creditors than the bank. The court said: "It is well settled in the authorities, and is in accordance with sound legal reason, that when, with knowledge of the trust character of the funds, the bank * * * aids in the appropriation of same to the trustee's personal debt, that it is, and of right should be, held liable." And again: "Its act in placing distinctly marked trust funds to the personal credit of Clagett was obviously wrongful, and it must bear the resulting consequences," and held the bank liable for the entire $12,000. This case seems to be the natural development of the Jones, Coleman, and Claxton Cases; the first illustrating the doctrine of benefits to the bank, the second and third the doctrine of nonparticipation; while this case places the liability on benefits obtained and participation in the wrong. It is noteworthy that Adoue and Lobit were exonerated of any intent to injure the trust funds, and their participation consisted solely in placing distinctly market trust funds to the personal checking account of Compton, whence they were diverted to Compton's private debts. It was sufficient that they have notice of the trust, had allowed themselves to be used as instruments for its diversion under circumstances which should have put them on notice.

This case cites Coleman v. Bank, 94 Tex. 607, 63 S. W. 867, 86 Am. St. Rep. 871, as authority, and I see no conflict but a complete accord with Interstate Nat. Bank v. Claxton, 97 Tex. 569, 80 S. W. 604, 65 L. R. A. 820, 104 Am. St. Rep. 885. In the Claxton Case, Claxton, the cestui, had given the trustee, a broker, full authority to deposit Claxton funds in the trustee's general account, to be commingled with personal funds as well as numerous trust funds of strangers to Claxton. The account was not named in the bank in any way as a trust fund. The bank did nothing in connection with it, with one exception pointed out earlier in this opinion, except to honor checks given to persons not connected with the bank; in other words, did not participate in the diversion. Moreover, the Adoue & Lobit Case is founded on Moore v. Hanscom, 101 Tex. 293, 106 S. W. 876, 108 S. W. 150, which was a litigation of an angle of same case and facts as was involved in the Adoue & Lobit Case. The court consisted of Justices Gaines, Brown, and Williams when both opinions were written, and two of those three great minds were still on the court when the Adoue & Lobit Case was decided. Those three opinions were intended to be, and I believe are, in harmony. If not, then U. S. F. & G. v. Adoue & Lobit, being the last expression of that court, should control.

I see no reason why the fact that Peckham often did what the trust agreement forbade, to wit, used his personal account and the trust account each in the trust affairs as suited his convenience, should be of any importance. No one contends that the other partners in the Wichita Royalty Company condoned it or even knew of it. He had no right to do so, and the bank participating in such conduct does so at its peril.

It is true that Scannell, when he became trustee after Peckham's death, indorsed the notes Peckham had made for the trust, but no consideration moved to the trust for such act. Scannell did not know the true facts regarding the trust's claim against the bank and without knowledge there is no ratification, and, if Peckham was without authority to enter into this Marlboro transaction, then Scannell was equally without authority to ratify it. Even if it be said that the notes were valid obligations, this still would not justify the instructed verdict, for the cross-action was in excess in amount of the bank's suit.

If the controverted facts should be resolved by the trier thereof that Harrell knew of these unlawful acts of Peckham, in aid of which he loaned the agencies of the bank, then limitation would not begin running sooner than Peckham's death, as far as we are concerned;

that is to say, limitation started running when the facts were, or should reasonably have been, discovered. In the present state of the record, there is nothing to show any reason why that date was sooner than Peckham's death. He had and exercised the sole and exclusive management of the trust until he died. In such event the bar of limitation is not complete, for Peckham had been dead less than two years when this suit was filed.

Moreover, as to those funds which the bank accepted from the trustee as being for the named purpose shown on the voucher, and then placed to Peckham's personal account, contrary to such voucher statements, the bank assumed the duty to see that same were used for trust purposes. The cestui que trust did not know of such diversion. The bank thereafter paid those funds out on Peckham's personal checks for nontrust purposes. The cestuis were still in ignorance thereof. Limitation does not run against a depositor in favor of the bank depository until demand therefor. "The fact that the conduct of the appellant bank was also wrongful or tortious, and that it may have so conducted itself with its president as to have given appellee (Wichita Royalty Company) a right of action for such wrongdoing, ought not, and we do not believe will, defeat his right of action upon the implied contract to pay. If we are correct in our position, the statutes of limitation did not begin to run until demand and refusal to pay." First State Bank v. Shannon (Tex. Civ. App.) 159 S. W. 398, 401 (writ denied).

In the following cases Texas has been said to be committed to the rule that equitable frauds and resulting and constructive trusts are subject to the four-year statute of limitations (Rev. St. 1925, art. 5529) as well as "actual" frauds: Ripley v. Withee, 27 Tex. 14; Anding v. Perkins, 29 Tex. 348; Hand v. Errington (Tex. Civ. App.) 233 S. W. 567 (Fort Worth); Id. (Tex. Com. App.) 242 S. W. 722; Id. (Tex. Com. App.) 248 S. W. 25. In the last case we held that limitation would not run against a cestui who was ignorant of the trust nor in favor of the trustee who was ignorant of the trust.

The judgment of the trial court is reversed, and the cause remanded.

CONNER, Chief Justice.

My associates having differed in the disposition of this case, it has been referred to me for a determination of the proper course to give it. In the several opinions written by them the facts and governing authorities have been so fully set forth and discussed that I shall express my view of one or more of the several vital questions involved in a general way only, and this with the thought that perhaps thereby counsel representing the respective parties may the better read the mind of the court as a whole, and from all opinions trace a plain path to a correct and just result.

By reference to the declaration of trust set out in the opinion of Justice DUNKLIN, the "general" purpose of the association of shareholders was to "purchase and sell oil and gas royalties and other oil and gas properties." For the accomplishment of the purpose expressed, R. R. Robertson was designated as trustee. On January 2, 1923, Robertson was duly succeeded by G. W. Peckham. By the terms of the trust agreement, the trustee Peckham was not chargeable with any of the debts of the association. He was given power to appoint or remove agents, define their duties, fix their compensation, and generally to "have full and exclusive power and authority to conduct the business and affairs of this trust, to purchase, contract for, lease, or otherwise acquire any property necessary or proper for the trust." He was also given power to borrow money, give notes, and mortgage the property of the trust to secure the same.

If detached from all other circumstances, I would incline to the view that the trustee Peckham, under the very general powers vested in him by the trust agreement, would, as a matter of law, be authorized to make the purchase he did of the interest in the townsite addition to the city of Wichita Falls. We judicially know that at the time the city was situated in the midst of a rapidly developing oil and gas field; its citizens were doubtless buoyant and hopeful of making a commercial center of great importance; and Peckham's associates in the enterprise were presumably in the class of financial leaders. It is also common knowledge that large profits have been realized by individuals and associations in promoting and marketing additions to cities such as Fort Worth, Dallas, Houston, and others. While the trust instrument recites that the general purpose was to invest in oil and gas properties, it is evident that the final, ultimate purpose and object was the acquisition of profits to the stockholders, and there is no express inhibition of a purchase of other kinds of real estate. On the contrary, as above noted, the trustee was given power to acquire "any property necessary or proper for the trust." He was only chargeable for fraud, and the fraud, if any, as I view the case, first appears in the acts of Peckham, aided by the officers of the bank, in transferring the pro-

681

ceeds of the association's note for $43,000 to the individual account of Peckham. This certainly seems to have been irregular, and my attention has not been called to any evidence which made the transfer necessary as a matter of convenience or otherwise. No authority therefor appears in the trust agreement, and it was followed by Peckham later conveying the interest he acquired in the addition to his principal at a price greater than it cost him; thus violating his duty as trustee in fraud of the just rights of the association. There is also evidence to the effect that Peckham, in his own name, in one or more instances, purchased oil leases or royalties with funds of the association deposited to his individual credit, and later transferred them to the association at a profit to himself.

It has been said that "coming events cast their shadows before." On the contrary, past events must leave their shadows behind, and, if analyzed, may give a clearer and more accurate view of the character of the past event. The evidences, therefore, of such purchases with funds of the association in his own name with conveyances to his principal at a greater price than he paid at least raises the fact issue of whether the transfer of the funds of the association to the private or individual account of Peckham was with the preconceived purpose and plan on Peckham's part to thereby make a profit. If so, it may well be said that the transfer of the proceeds of the association's note for $43,000 to his own name constituted a fraud, and it seems to be well settled, for the purpose of so showing, that the subsequent acts of Peckham referred to fall in the class of competent evidence. As said in section 142, vol. 1, Jones, Blue Book of Evidence:

"In the absence of any admission as to the extent of a party's knowledge of the matter in issue, or of the motives which actuated the commission or omission of his acts, or provoked his intention as to a line of conduct, evidence of his previous statements or behavior, as well as of later acts, furnishes the foundation on which an inference may be based; and experience has shown that the largest class of cases in which facts apparently collateral to the issue are admitted is that in which it becomes material to prove knowledge or intent. When it becomes material to show the motive or intent which inspired an act, or the knowledge under which one has acted, it is relevant for such purpose, under certain limitations, to prove other similar acts which explain such motive or bring home to the party the knowledge sought to be proved. Stephen thus more

fully states the rule: 'When there is a question whether a person said or did something, the fact that he said or did something of the same sort on a different occasion may be proved; if it shows the existence on the occasion in question of any intention, knowledge, good or bad faith, malice or other state of mind, or of any state of body or bodily feeling, the existence of which is in issue or is deemed to be relevant to the issue; but such acts or words may not be proved merely in order to show that the person so acting or speaking was likely on the occasion in question to act in a similar manner.' It frequently happens that such motive or intent can be shown in no other way, while a single act might leave the secret motives of the party in doubt. Such act, in connection with others of the same character, may afford decisive proof and remove all uncertainty. Cases of fraud present a still more stringent necessity for the application of the same principle; for fraud, being essentially a matter of motive and intention, is often deducible only from a great variety of circumstances, no one of which is absolutely decisive; but all combined together may become almost irresistible as to the true nature and character of the transaction in controversy. * * * The law is quite clear that, if the act complained of is one of a nefarious series, part of a set plan or correlated commission of fraudulent dealings which shows that the one charged has devoted a misdirected energy to the acquisition of money or property by cheating or other illegal practices, evidence of it is always relevant."

If the appellee bank had notice of the fraudulent plan or fraud, if any, of the trustee, or had knowledge of such facts or circumstances as, if pursued with due diligence and care, would have brought home to the bank knowledge of the trustee's violation of the trust imposed in him amounting to a fraud, it would, of course, be liable. Whether such be the case is to be determined by the facts and circumstances appearing at the time of the execution of the note for $43,000 and of the transfer of the proceeds thereof to Peckham, together with such further evidences as will illustrate and give light to those transactions. Of course, all intervening circumstances and relevant testimony should be looked to. Should the jury find fraud on the part of Peckham and that the officers of the appellee bank are affected with knowledge or notice thereof, then the bank should be held to suffer the loss of the Royalty Company for all profits of Peckham arising from purchases in his own name, with reconveyance to the trust

and also for all moneys of right belonging to the association, paid to the bank upon the individual debts of Peckham. In this connection, however, I should perhaps add that, in my view, the bank's liability in no event can extend beyond the amount of profits acquired by Peckham in fraud of his principal, and such sums, if any, as Peckham, out of the trust fund, may have paid to the bank on his individual debts or obligations, the bank of course being entitled to credit on the obligations of the association for all such part of the association funds as were actually credited on the obligations, regardless of the fact that they may have been drawn out of Peckham's personal account.

In view of a new trial and of a thorough discussion of the evidence and authorities by my associates in their several opinions, I think it only necessary to add that I concur in the conclusion of Mr. Justice LATTIMORE that the judgment below should be reversed and the cause remanded for further proceedings.

### On Rehearing.

POWER, Justice.

This cause is before the court on motion for rehearing. I have carefully reviewed the evidence. It is my judgment that competent evidence evincing fraud and collusion was not proven sufficient to form a basis for a jury issue. The evidence must be of sufficient force to register more than a suspicion or surmise.

It is my opinion further that, under the facts, appellants' cross-action was barred by limitation.

Without further restating the case or the law applicable thereto, I approve the reasoning and conclusion of Judge DUNKLIN in his original opinion, and concur in the conclusion reached by him that the judgment of the trial court should be affirmed.

LATTIMORE, Justice.

I am compelled to dissent, adhering to my views as expressed in the opinion filed.

### On Appellants' Motion for Rehearing.

DUNKLIN, Chief Justice.

In compliance with appellants' request, the following corrections and explanations are made in the recitals appearing in the former opinion by Associate Justice DUNKLIN, with additions thereto.

The fifty-seven checks on which the cross-action was based were all drawn on the appellee City National Bank, and on the reverse side of each check was a notation indicating that there was attached thereto a voucher describing the purposes for which the checks were drawn, including payments to the bank upon obligations of the Royalty Company; purchase and improvement of the Marlboro addition; and purchase of oil royalties. And, according to vouchers which had been attached thereto originally, but detached before the checks were presented to the bank, and the books and records found in Peckham's office, the oil royalties, for which checks were so given, had theretofore been purchased in Peckham's name and with his own funds, and some of them he did not in fact own at that time. The further statement that one check was given for purchase of W. H. Peckham's interest in the Marlboro addition should have read that it was given for Geo. W. Peckham's interest in that addition. All the checks were deposited to the account of Geo. W. Peckham, but made payable to the bank itself.

The statement that "on April 10, 1926, Geo. W. Peckham conveyed his one-half interest to the Wichita Royalty Company, subject to the debts outstanding against it," was not intended as a finding that by that instrument the title passed to the Royalty Company and that the company assumed the outstanding indebtedness against the property. In subsequent portions of the opinion, it clearly appears that the instrument was never delivered to any one in behalf of the company, but was kept and concealed by Scannell under instructions from the trustee Peckham until after Peckham's death, and the stockholders never knew of it until after the institution of this suit.

Another statement in the opinion reads as follows: "Peckham also received credit on his personal account for $6,000 realized from oil investments belonging to the Royalty Company which had theretofore been deposited to his personal credit in the Security National Bank."

The testimony bearing on that statement is exceedingly involved, but the following statement in the motion with reference thereto will be accepted as correct: "One of the checks was for $6,000.00 to the Security National Bank where Peckham received personal credit without accounting therefor in any manner upon the record. Another and a totally different item of $6,000.00 was evidenced by a $6,000.00 cashier's check issued by the Wichita State Bank & Trust Company and represented the proceeds of a royalty sale by the trust, but which $6,000.00 was depos-

ited to Peckham's private account with the City National Bank and unaccounted for to any extent whatever. Other items totalling $6,048.00 for which Peckham received personal credit with the appellee bank and made no account thereof whatsoever were obtained by Peckham from the appellee bank as escrow agent in the trust's sale of a royalty, checks by the purchaser being deposited with the escrow contract in the bank, the checks being made payable to Wichita Royalty Company and Peckham, the bank delivered to the purchaser the deed of assignment to the royalty interest, the check totalling $6,048.00 payable to the trust was delivered to Peckham and personal credit given him therefor."

The further statement that Scannell "had charge of the office" of the Royalty Company in Wichita Falls is withdrawn. It is manifest from other portions of the opinion that Geo. W. Peckham was sole trustee of the company with supreme control of its affairs and the office of the company in Wichita Falls, and also its books and records kept by him in that office. Scannell was employed by Peckham as secretary and treasurer of the company, and, as testified to by him, he "kept books, records, and did detail work for the Wichita Royalty Company" under supervision and direction of Peckham. Scannell was not a stockholder during that period, and Peckham's appointment of him as secretary and treasurer was therefore in violation of the provisions of the declaration of trust under which Peckham acted as trustee. And Scannell further testified that all he did was under Peckham's instructions, one of which was that the books and records were to be kept in a safe, and that no one was to be allowed to see them. The statement that Scannell "also made monthly reports to the 1,300 stockholders" was incorrect, since, according to his uncontroverted testimony, reports to the stockholders were made annually and not monthly, and were prepared by Peckham and mailed out by Scannell under his directions.

Complaint is made of this further statement in the opinion:

"Nor have appellants presented any complaint in behalf of the stockholders that the failure of Scannell to sooner seek recovery of damages claimed in the cross-action was prompted by fraud on his part and participated in by the bank."

That statement had reference to the cross-action filed by Scannell for and in behalf of the Royalty Company, which, in the opinion of the writer, did not seem to embody any charge of fraud on his own part in his fail-

ure sooner to seek a recovery of damages claimed in the cross-action. However, counsel for appellants have cited his testimony that, after George W. Peckham's death, he joined with W. H. Peckham, brother of George W. Peckham, and with Harrell's assent thereto, in an agreement to conceal from the stockholders the fraud theretofore practiced by George W. Peckham, to the end that his estate might not suffer from the demands of the stockholders for damages based thereon.

The motion for rehearing also contains a request for additional findings. The additional findings so requested cover several typewritten pages, many of which are reflected in the findings in the opinion already filed. As shown in that opinion, the facts recited were ample to sustain a finding by the jury that a fraud was practiced by Geo. W. Peckham upon the stockholders he represented, to their injury. The opinion also embodied a recital of what was thought to be the principal facts on which appellants relied to show that the bank through its duly authorized officers and Harrell, individually, were guilty of fraudulent participation in the fraud of the trustee Peckham. The additional findings sought include a recital of evidence of numerous transactions in detail by Peckham, all tending to show fraud practiced by him on the stockholders of the Royalty Company. That evidence further shows that those transactions were consummated through deposits in and withdrawals from the appellant bank; and the action of the bank in accepting such deposits and honoring Peckham's checks thereon is relied on in further support of the charge made of fraudulent collusion by the bank through its duly authorized officers and Harrell, individually, with Peckham in his fraud. But the majority of this court are of the opinion that such additional evidence, at all events, is of no greater weight to sustain the conclusion sought than the facts recited in the former opinion; and that all the evidence on that issue, taken as a whole, is insufficient of itself to establish a prima facie case of liability on the part of appellees. And a recital in these conclusions of the additional evidence set out in the motion would unduly extend this opinion, and is unnecessary, since that evidence appears in the statement of facts and therefore none the less available for consideration by the Supreme Court in its final determination of this appeal.

After due consideration, the motion for rehearing is overruled by the majority of this court; Associate Justice LATTIMORE dissenting, as before.